T.C. Memo. 1995-549


UNITED STATES TAX COURT


BEAVER BOLT, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 22087-93.          Filed November 20, 1995.


<u>Alan M. Spinrad</u> and <u>Merritt S. Yoelin</u>, for petitioners.

<u>Cheryl B. Harris</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


COLVIN, <u>Judge</u>:  Respondent determined deficiencies in

petitioner's Federal income tax and additions to tax as follows:

| | | Additions to Tax | | |
| | | Sec. | Sec. | Sec. |
| <u>Year Ended</u> | <u>Deficiency</u> | <u>6653(a)</u> | <u>6659</u> | <u>6662(h)</u> |
| June 30, 1989 | $49,842 | $2,492.10 | $14,952.60 | -- |
| June 30, 1990 | 49,843 | -- | -- | $19,937 |

The issues for decision are:

(1)  Whether petitioner may amortize $383,400, or some other amount, for Jane Grecco's covenant not to compete.  We hold that petitioner may amortize $324,100.

(2)  Whether petitioner is liable for additions to tax for: (a) Negligence under section 6653(a) for 1989; (b) valuation overstatement under section 6659 for 1989; (c) substantial understatement under section 6661 in the alternative to section 6659 for 1989; and (d) an accuracy related penalty under section 6662(h) for gross valuation misstatement, or, in the alternative, under section 6662(a).  We hold that it is not.

Section references are to the Internal Revenue Code in effect for the years in issue.  Rule references are to the Tax Court Rules of Practice and Procedure.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

1.  Formation of Petitioner and Petitioner's Operations

Petitioner had its principal place of business in Portland, Oregon, during the years in issue and when it filed its petition. Petitioner is in the business of marketing and distributing bolts, nuts, and other fasteners.

Jane Grecco (Grecco), James Colbert (Colbert), and Dan Allen (Allen) formed petitioner in 1979.  They each had experience distributing bolts, nuts, and other fasteners.  Grecco and

Colbert were working for a nuts and bolts distributor, Industrial Products Co., when they decided to start their own business. They brought in Allen to make outside sales. Allen was president, Grecco was vice president, and Colbert was secretary/treasurer of petitioner. They were also petitioner's directors.

Grecco, Colbert, and Allen each owned 50 shares of petitioner's stock. They each invested $10,000 in petitioner, consisting of $5,000 for the stock and a $5,000 loan. Petitioner later repaid the loans. Petitioner also borrowed $40,000. Grecco, Colbert, and Allen did not invest additional funds in petitioner.

Petitioner has been profitable since its beginning. Grecco, Colbert, and Allen asked customers of their earlier businesses to switch to petitioner. Grecco and Colbert brought customers to petitioner. For example, Grecco brought Brod & McClung, which Grecco had supplied at other nuts and bolts distributors for which she worked. Grecco was petitioner's principal contact with suppliers.

At first, petitioner's only employees were Grecco, Colbert, and Allen. Petitioner hired another employee about a year after it began to operate.

In 1982 and 1983, Allen redeemed his 50 shares of petitioner's stock, and Ron Tiedemann (Tiedemann) bought 50

shares of petitioner's stock from petitioner. After these transactions, Grecco, Colbert, and Tiedemann each owned 50 shares of petitioner's stock, and Grecco was president, Tiedemann was vice president, and Colbert was secretary/treasurer.

2. The Stock Purchase Agreement

On November 6, 1986, Grecco, Colbert, and Tiedemann signed a stock purchase agreement with petitioner. The agreement gave petitioner the option to repurchase its stock owned by a terminated employee. The agreement included a formula that set the purchase price for the stock. If petitioner exercised the option, the employee/stockholder would transfer the stock to petitioner and would be bound by a covenant not to compete for 3 years. The agreement provided that payments would be reduced by 25 percent if a party breached the covenant.

On February 18, 1988, Grecco transferred her stock in petitioner to herself, as Trustee of the Grecco Trust, a revocable living trust. Colbert, Tiedemann, and petitioner consented to the transfer.

3. Grecco's Departure From Petitioner

In early June 1988, Colbert and Tiedemann told Grecco that they were concerned about her management style. They thought that she lacked the respect of some of the employees, and that she was habitually late to work. Colbert thought that she had become paranoid and was too critical of the other employees. On

June 14, 1988, Colbert and Tiedemann proposed that Grecco resign as president, take a 6-month paid leave of absence, and, at the end of 5 months, decide how to proceed.  Grecco did not accept the proposal.

The board of directors met on June 16, 1988.  At the meeting, the board of directors elected Tiedemann secretary, removed Grecco as president, and elected Colbert president.  The board of directors voted to end Grecco's employment with petitioner.  Grecco contended that the covenant not to compete contained in the 1986 stock purchase agreement was unenforceable on the grounds that the board of directors had improperly terminated her.

Petitioner and Grecco negotiated a financial settlement for Grecco.[1]  Grecco wanted to maximize the amount of money she would receive from petitioner.  The board of directors met on June 30, 1988.  To maximize her leverage, Grecco said she would compete with petitioner and argued that petitioner had violated

---

[1]  Petitioner's June 22, 1988, offer included the following:

> 5.  The corporation will purchase the stock owned by Ms. Grecco pursuant to the price determination as set forth in the Stock Purchase Agreement * * * the purchase price should be somewhere between $400,000 and $450,000.  However, there would be an allocation of the total purchase price so that the amount determined to be the book value of the stock as of June 30, 1988, would be the amount allocated to the stock.  The balance of the price should be allocated to either a covenant not to compete or a consultants type of agreement in order that the payments pursuant thereto would be deductible to the corporation.  * * *

its fiduciary duties, corporate laws, and the Employee Retirement Income Security Act of 1974, Pub. L. 93-406, 88 Stat. 829. The parties discussed the general terms for separating Grecco from petitioner at this meeting. The board of directors rehired Grecco retroactive to June 16, 1988, and she resigned from petitioner effective July 1, 1988. In exchange, the board of directors offered Grecco a preliminary settlement package and proposed to pay her about $125,000 for her stock and about $300,000 for her agreement not to compete. The board of directors approved the payment of bonuses (and retirement contributions based on 7.326 percent of the bonus) for 1988 to petitioner's employees: $73,000 to Colbert, $74,000 to Tiedemann, and $71,000 to Grecco.

4.   Redemption of Grecco's Stock

On December 23, 1988, petitioner and Grecco signed a redemption agreement. Petitioner agreed to pay the Grecco Trust $130,000 to redeem the stock owned by the trust. Petitioner also agreed to pay to Grecco or on her behalf a $71,000 bonus, severance pay of $45,000, a retirement plan contribution of $30,000, and life and medical insurance premiums. Petitioner also transferred to Grecco a life insurance policy on her life, a 1984 BMW, and an athletic club membership in consideration for her resignation as petitioner's president. Grecco agreed not to

compete with petitioner for 3 years in Oregon and Washington, beginning July 1, 1988.

The redemption agreement stated that petitioner paid Grecco $383,400 for the covenant not to compete.[2]  Petitioner agreed to pay Grecco $77,400 on December 23, 1988, with the balance to be paid in equal monthly installments of $5,100, beginning January 23, 1989, through December 23, 1993.  Grecco agreed to pay damages equal to 25 percent of the total payments under the agreement if she breached the covenant not to compete. The parties did not negotiate the value to be allocated to the covenant not to compete.

---

[2]  The redemption agreement provided in part:

10.  In consideration of the amounts to be paid by Corporation to Grecco and the other Agreements of the Corporation set forth herein, Grecco covenants and agrees that for a period of three (3) years from July 1, 1988, within the geographic area of Oregon and Washington, Grecco shall not, directly or indirectly, on behalf of or in concert with any other person, firm, proprietorship, partnership or corporation of which Grecco is now or hereafter an employee, agent, proprietor, partner, officer, director or shareholder, engage in a business which sells, at wholesale or retail, products similar to products sold by Corporation on July 1, 1988, or proposed to be handled by Corporation on July 1, 1988.  As compensation for this covenant not to compete, Corporation shall pay to Grecco a total of THREE HUNDRED EIGHTY THREE THOUSAND FOUR HUNDRED ($383,400.00) DOLLARS.  * * *

5.   Colbert's Departure From Petitioner and Petitioner's
     Prepayment of Amounts It Owed to Grecco Under the
     Redemption Agreement

In the fall of 1990, Colbert decided to withdraw from petitioner to begin doing business as Viking Bolt in direct competition with petitioner.  This was about 2-1/2 years after Grecco's covenant not to compete was in effect.  Grecco sent petitioner a letter dated October 26, 1990, stating that she objected to the redemption of Colbert's stock based on paragraph 14 of the redemption agreement.[3]

Petitioner sought to prepay at a discount the amount it owed on Grecco's covenant not to compete.  By letter dated November 13, 1990, Grecco said that she would agree to the prepayment if her obligation not to compete ceased on December 1, 1990, instead of June 30, 1991.  Petitioner did not agree to end the covenant early.  On February 14, 1991, petitioner prepaid the entire amount it owed to Grecco and the Grecco Trust, without discount or early release of the covenant.  About 4-1/2 months remained on the covenant.

---

[3] Under par. 14 of the redemption agreement, until all payments under the agreement have been made, petitioner must have Grecco's written consent before taking various actions, including reorganizing its corporate structure, except in the regular course of business.

6. The Value of Petitioner's Stock Held by the Grecco Trust

The parties agree that the fair market value of the Grecco Trust's 50 shares of petitioner was $189,300 as of June 30, 1988.

7. Grecco as a Potential Competitor

In 1988, Grecco was 44 years old, in good health, and had more than 20 years' (9 with petitioner) experience in the nuts, bolts, and fasteners distribution business. Grecco's primary responsibility before she left petitioner was buying inventory and dealing with suppliers. Previously at petitioner and at her prior jobs in the industry, she had been responsible for buying inventory and taking telephone orders from customers.

Grecco knew petitioner's customer base, its pricing, and materials sources. She had good rapport with vendors. She took some sales orders over the phone, but she was not directly responsible for sales when she left petitioner. She also worked to collect accounts receivable.

Grecco organized fishing trips for some customers and attended an annual company open house, but she had little direct contact with most customers when she left petitioner.

Grecco substantially contributed to petitioner's success. She still lives in the Portland area.

8.   Grecco's Financial Status

In 1988, Grecco's annual dividend and interest income was about $4,000, and she had $30,000 equity in her home, an interest in a limited partnership, and more than $80,000 in retirement savings, not including petitioner's 1988 contribution to the retirement plan and any growth in prior contributions.

Petitioner paid its directors from 1984 to 1988 as follows:

| Fiscal Year Ending June 30, 1984 | Salary | Retirement Plan |
| --- | --- | --- |
| Tiedemann | $90,500 | $22,625 |
| Colbert | 90,500 | 22,625 |
| Grecco | 90,500 | 22,625 |
| | | |
| Fiscal Year Ending June 30, 1985 | | |
| Tiedemann | 166,000 | 17,610 |
| Colbert | 166,000 | 17,610 |
| Grecco | 166,000 | 17,610 |
| | | |
| Fiscal Year Ending June 30, 1986 | | |
| Tiedemann | 115,000 | 14,038 |
| Colbert | 115,000 | 14,038 |
| Grecco | 115,000 | 14,038 |
| | | |
| Fiscal Year Ending June 30, 1987 | | |
| Tiedemann | 154,000 | 27,598 |
| Colbert | 136,000 | 24,132 |
| Grecco | 136,000 | 24,132 |
| | | |
| Fiscal Year Ending June 30, 1988 | | |
| Tiedemann | 244,000 | 30,000 |
| Colbert | 238,800 | 30,000 |
| Grecco | 236,455 | 30,000 |

Petitioner had paid Grecco a salary of $165,455 in petitioner's fiscal year 1988 when the parties approved the redemption agreement.  Grecco estimated that her salary and

bonus would have been at least $180,000 per year for each of the following 3 years if she had stayed at petitioner.

9.  Sue Spencer

In June 1988, Sue Spencer (Spencer) was one of petitioner's top two salespeople.  However, Grecco would not have tried to hire her if Grecco had started a competing business, and Spencer probably would not have left petitioner to work with Grecco in a competing business.  Petitioner fired Spencer in 1992, and Colbert hired her to work at Viking Bolt.

OPINION

1.  Covenant Not to Compete

    a.  Background

The first issue we must decide is how much, if any, petitioner may deduct for Grecco's covenant not to compete. Respondent argues that the covenant not to compete lacked economic significance because the parties did not negotiate the amount to be allocated to the covenant.  Respondent contends that the covenant was used primarily to avoid tax.  Respondent contends that the value of the covenant was $52,669.  Petitioner argues that the covenant was worth the price petitioner paid for it under the agreement, $383,400, or, in the alternative, $324,100, the difference between the total amount it paid Grecco under the agreement and the value of the stock redeemed.

A taxpayer generally may amortize intangible assets over their useful lives. Sec. 167(a); Citizens & S. Corp. v. Commissioner, 91 T.C. 463, 479 (1988), affd. 919 F.2d 1492 (11th Cir. 1990). To be amortizable, an intangible asset must have an ascertainable value and a limited useful life, the duration of which can be ascertained with reasonable accuracy. Newark Morning Ledger Co. v. United States, 507 U.S. ___, ___, 113 S. Ct. 1670, 1675, 1676 n.9, 1681-1683 (1993). A covenant not to compete is an intangible asset that has a limited useful life and, therefore, may be amortized over its useful life. Warsaw Photographic Associates v. Commissioner, 84 T.C. 21, 48 (1985); O'Dell & Co. v. Commissioner, 61 T.C. 461, 467 (1974).

We must decide whether any of the amount allocated to the covenant not to compete was a disguised payment for Grecco's stock in petitioner. The amount a taxpayer allocates to a covenant not to compete is not always controlling for tax purposes. Lemery v. Commissioner, 52 T.C. 367, 375 (1969), affd. per curiam 451 F.2d 173 (9th Cir. 1971). We strictly scrutinize an allocation if the parties do not have adverse tax interests because adverse tax interests deter allocations which lack economic reality. Wilkof v. Commissioner, 636 F.2d 1139 (6th Cir. 1981), affg. per curiam T.C. Memo. 1978-496; Haber v. Commissioner, 52 T.C. 255, 266 (1969), affd. without opinion 422 F.2d 198 (5th Cir. 1970); Roschuni v. Commissioner, 29 T.C. 1193,

1202 (1958), affd. 271 F.2d 267 (5th Cir. 1959); Baird v. Commissioner, 25 T.C. 387, 393 (1955); McDonald v. Commissioner, 28 B.T.A. 64, 66 (1933); see O'Dell & Co. v. Commissioner, supra at 468. A covenant not to compete must have "economic reality", i.e., some independent basis in fact or some arguable relationship with business reality so that reasonable persons might bargain for such an agreement. Patterson v. Commissioner, 810 F.2d 562, 571 (6th Cir. 1987); affg. T.C. Memo. 1985-53; Schulz v. Commissioner, 294 F.2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 235 (1960); O'Dell & Co. v. Commissioner, supra at 467-468.

   b.   Petitioner's and Grecco's Lack of Adversarial Tax
        Interests

Respondent points out that petitioner had an incentive to allocate a large amount to the covenant not to compete because petitioner could amortize that amount over the 3-year life of the covenant. Respondent also points out that Grecco had no incentive to minimize the amount allocated to the covenant because the tax rates for ordinary income and capital gains were generally the same during the years at issue. Before Congress repealed capital gains tax preferences, the grantor of a covenant not to compete had an incentive to allocate less to the covenant and more to stock because the payment he or she received for the covenant was ordinary income, while the amount realized from the sale of stock might be taxed as capital gains. See Schulz v. Commissioner, supra at 55, and Landry v. Commissioner, 86 T.C.

1284, 1307-1308 (1986) (both cases uphold an allocation by the parties that resulted from arm's-length negotiations between parties with adverse tax interests); O'Dell & Co. v. Commissioner, supra at 468 (the adverse tax interests of the parties to a noncompetition agreement deter allocations which lack economic reality). Absent adverse tax interests, we strictly scrutinize allocations to a covenant not to compete.

2. Effect of the Parties' Stipulation That Grecco's Stock in Petitioner Was Worth $189,300

Petitioner paid Grecco $513,400 to redeem her stock and for her covenant not to compete for 3 years. Petitioner and Grecco allocated $383,400 of that amount to the covenant.

Respondent and petitioner agree that the value of Grecco's redeemed stock was $189,300. The difference between petitioner's payment to Grecco under the redemption agreement ($513,400) and the value of the stock ($189,300) is $324,100.

Petitioner and Grecco did not have adverse tax interests with respect to the allocation of $383,400 to the covenant. However, Grecco and petitioner negotiated the total redemption price at arm's length. Also, petitioner and respondent stipulated that the stock was worth $189,300. Petitioner contends that the remaining payments were payments for Grecco's agreement not to compete.

Respondent misses the point of petitioner's argument by reiterating that Grecco and petitioner did not have adverse

interests as to the allocation to the covenant.  Respondent made no argument that the difference between petitioner's payment ($513,400) and the agreed value of the stock ($189,300) was payment for anything other than the covenant not to compete. These facts suggest that the value of the covenant was $324,100, the difference between the total amount petitioner paid Grecco ($513,400) and the value of the stock ($189,300).

3.  Economic Reality of the Covenant Not to Compete

A value of $324,100 for the covenant is entirely supported by the record in this case.  Courts apply numerous factors in evaluating a covenant not to compete.  These include:  (a) The seller's (i.e., covenantor's) ability to compete; (b) the seller's intent to compete; (c) the seller's economic resources; (d) the potential damage to the buyer posed by the seller's competition; (e) the seller's business expertise in the industry; (f) the seller's contacts and relationships with customers, suppliers, and other business contacts; (g) the buyer's interest in eliminating competition; (h) the duration and geographic scope of the covenant; and (i) the seller's intent to reside in the same geographic area.  Kalamazoo Oil Co. v. Commissioner, 693 F.2d 618 (6th Cir. 1982), affg. T.C. Memo. 1981-344; Forward Communications Corp. v. United States, 221 Ct. Cl. 582, 608 F.2d 485, 492 (1979); Sonnleitner v. Commissioner, 598 F.2d 464, 468 (5th Cir. 1979), affg. T.C. Memo. 1976-249; Fulton Container Co.

v. United States, 355 F.2d 319, 325 (9th Cir. 1966); Annabelle Candy Co. v. Commissioner, 314 F.2d 1, 7-8 (9th Cir. 1962), remanding T.C. Memo. 1961-170; Schulz v. Commissioner, supra at 54; Peterson Machine Tool, Inc. v. Commissioner, 79 T.C. 72, 85 (1982), affd. 84-2 USTC par. 9885, 54 AFTR 2d 84-5407 (10th Cir. 1984); Major v. Commissioner, 76 T.C. 239, 251 (1981); O'Dell & Co. v. Commissioner, supra; Rudie v. Commissioner, 49 T.C. 131, 139 (1967); Levinson v. Commissioner, 45 T.C. 380, 389 (1966).

### a.   Grecco's Ability to Compete

Respondent concedes that Grecco had the physical and mental ability to compete with petitioner.  However, respondent argues that Grecco would not have been able to take much business from petitioner if she had competed.

We disagree.  We think Grecco's past success in cofounding petitioner shows she has the ability to compete, and that she knows how to surround herself with the necessary personnel to establish a successful business.  We conclude that Grecco would have been a good competitor.  This factor favors petitioner.

### b.   Grantor's Intent to Compete

If the grantor would likely compete with the buyer, we are more likely to sustain an allocation to the covenant. Sonnleitner v. Commissioner, supra (among other factors, grantor had threatened to compete).  In contrast, if the grantor is unlikely to compete with the buyer, courts are less likely to

sustain an allocation to the covenant not to compete. Schulz v. Commissioner, supra (allocation to a covenant not to compete not sustained because, in addition to other reasons, the covenantor did not intend to compete); Major v. Commissioner, supra (covenant had minimal value where the buyer felt he could get his own customers and the grantor was of advanced age and had health problems).

Respondent argues that the covenant had no value because Grecco did not intend to compete.

Grecco said during the financial settlement negotiations that she would compete with petitioner. She testified at the trial of this case that in 1988 she did not intend to compete with petitioner. However, she also testified that if she had not received a satisfactory financial settlement, she might have been forced to compete. Colbert testified that, without a covenant not to compete, he thought Grecco might take a job with a competitor, but he did not think she would start her own business. Tiedemann testified that he was concerned that Grecco would compete with petitioner.

These various statements of intent and expectation by Grecco, Tiedemann, and Colbert are less persuasive as to Grecco's intent than the objective facts. Grecco would no doubt have continued to need to work absent her payment from petitioner, and we expect that she would have stayed in the industry and area she

knew best.  Thus, we conclude that Grecco would have competed with petitioner if she had not received an ample financial settlement.  This factor favors petitioner.

c.    The Grantor's Economic Resources

Respondent concedes that Grecco had the financial resources required to compete with petitioner.  This factor favors petitioner.

d.    Potential Damage to Petitioner Posed by Grecco's Competition

Tiedemann testified that Grecco could take a substantial amount of business with her.  Colbert did not believe that the covenant was important.

Grecco had demonstrated her ability to work in the nuts, bolts, and fasteners industry.  Also, Grecco probably would have hurt petitioner's business if she competed because she probably would have taken clients from petitioner.  She did that when she left Industrial Products Co. to start petitioner.  This factor favors petitioner somewhat.

e.    Grecco's Business Expertise in the Industry

Respondent concedes that Grecco had extensive expertise in the nuts and bolts distribution industry.  This factor favors petitioner.

f.    Grecco's Contacts and Relationships With Suppliers and Customers

Grecco had much contact with petitioner's suppliers, but she had little contact with its customers when she left petitioner.  This factor favors petitioner somewhat.

g.  Petitioner's Interest in Eliminating Competition

It appears from the fact that the 1986 stock purchase agreement included an agreement not to compete that petitioner wanted to eliminate competition.  This is confirmed by the fact that petitioner paid Grecco $513,400 for her stock (which was worth $189,300) and for the covenant not to compete.  This factor favors petitioner somewhat.

h.  Duration and Geographic Scope of the Covenant

Grecco's covenant applied to competition in Oregon and Washington for 3 years.  We think these limits were reasonably drawn to keep Grecco from competing with petitioner.  This factor favors petitioner.

i.  Grecco's Intent to Reside in the Same Geographic Area

Grecco still resides in the Portland area.  This factor favors petitioner somewhat.

4.  The Liquidated Damages Provision

Respondent contends that the stock purchase agreement did not require petitioner to make any payment for the covenant not to compete.  Respondent argues that petitioner intended that the entire amount of the formula purchase price was to be payment for the departing shareholder's stock.  We disagree.

First, we fail to see why petitioner would pay $513,400 for stock the parties agree is worth $189,300.  Second, Grecco agreed to pay a 25-percent penalty if she breached the covenant not to compete.

5.   Expert Testimony

The parties each called expert witnesses to give their opinions about the value of the covenant not to compete.

Expert witnesses' opinions can aid the Court in understanding an area requiring specialized training, knowledge, or judgment.  However, as the trier of fact, the Court is not bound by the experts' opinions.  Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938).  The opinions of expert witnesses are weighed according to their qualifications and other relevant evidence.  Anderson v. Commissioner, 250 F.2d 242, 249 (5th Cir. 1957), affg. in part, remanding in part T.C. Memo. 1956-178; Johnson v. Commissioner, 85 T.C. 469, 477 (1985).

a.   Respondent's Expert

Respondent's expert, William E. Holmer (Holmer), concluded that the value of the covenant not to compete was $52,669. Holmer viewed the 25-percent penalty provision for breach of the covenant as evidence of what petitioner would pay Grecco for not competing.  He used $421,346 as the starting value of Grecco's stock in petitioner (as established by the stock purchase agreement), 25 percent of which is $105,337.  He weighed the conflicting positions of petitioner (which was a party to the stock redemption agreement; that agreement provided for 25 percent of the total purchase price as a penalty for breach of the covenant) and Grecco (who did not negotiate for payment for not competing versus payment for the stock), and concluded that

petitioner and Grecco would split the difference; thus, he estimated that the value of the covenant was $52,669.

We disagree with Holmer's estimate for several reasons. First, he should have used as a base amount $513,400 (total payments to Grecco), not $421,346. Second, his basis for reducing 25 percent of the base amount by 50 percent is speculative. Third, petitioner and its shareholders agreed to the liquidated damages percentage 2 years before petitioner forced Grecco out. Fourth, the liquidated damages provision applied to all of petitioner's shareholders, not just Grecco. Thus, it does not necessarily take into account the value of her covenant not to compete in particular. Fifth, the liquidated damages amount was calculated on the price petitioner paid Grecco for the stock and the covenant rather than being based solely on the covenant. Sixth, the fact that petitioner paid $513,400 for Grecco's stock (which the parties agree is worth $189,300) and the covenant, is a much better indicator of the value of the covenant because it is not subject to the flaws just stated.

b.  Petitioner's Expert

Petitioner's appraiser, Gregory A. Gilbert (Gilbert), concluded that the value of the covenant not to compete was $666,200. Gilbert used estimates of lost sales provided by Tiedemann, based on his estimate of the amount of business petitioner would lose if Grecco and Spencer competed with petitioner. Tiedemann exaggerated the amount of business Grecco

would take if she competed with petitioner. For example, he estimated, using sales for June 1988, that Grecco might take as much as 38.5 percent, or $125,165, of petitioner's monthly business. Gilbert discounted petitioner's potential lost sales by 39 percent to take into account the uncertainty of Tiedemann's estimate. He considered petitioner's ability to reattract business and an assumed cost savings from doing less business.

We think Gilbert greatly overestimated the value of the covenant not to compete. Gilbert relied too heavily on Tiedemann's estimates, and failed to consider the extent to which Colbert could retain some of the accounts. Grecco and Colbert testified that she could not have taken all of those accounts. Grecco's focus had changed from sales to suppliers. Finally, we think Gilbert's assumption that Grecco would hire Spencer, and obtain Spencer's customers, was incorrect because Spencer said she probably would not have worked with Grecco if Grecco competed and Spencer probably could not have taken very much of petitioner's business.

6. Conclusion

Although we have carefully considered the methodologies and conclusions of the two experts, we think the objective facts relating to Grecco's ability to compete give a more persuasive basis for deciding the value of her covenant not to compete.

Grecco was 44 years old in 1988, healthy, and fully able, both physically and mentally, to compete. She had a considerable

amount of experience in the nuts, bolts, and fasteners distribution business.  She had sufficient financial resources to form a competing firm, either alone or with co-owners.  She had good relationships with customers and suppliers.  Since in 1988 she worked primarily with suppliers, we believe her competitive impact would not have been a serious problem for petitioner if she operated alone.  However, she could probably have offset this by affiliating with others as she did when she and others formed petitioner, and continuing to focus on suppliers.  She knew how to surround herself with the necessary personnel, including salespeople, to establish a successful business.  Considering the entire record, we conclude that the value of the covenant not to compete was $324,100.

7.   Additions to Tax

     a.   Negligence

Respondent determined that petitioner is liable for the addition to tax for negligence under section 6653(a) for its tax year ended June 30, 1989.  Petitioner has the burden of proving that it was not negligent.  Neely v. Commissioner, 85 T.C. 934, 947 (1985).

Section 6653(a) imposes an addition to tax equal to 5 percent of the underpayment of tax if any part of the underpayment is due to negligence or intentional disregard of rules or regulations.  Negligence includes a failure to make a reasonable attempt to comply with the provisions of the Internal

Revenue laws or to exercise ordinary and reasonable care in that respect.  Sec. 6662(c).  Negligence is a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances.  Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982); Neely v. Commissioner, supra.

We found that the covenant had economic significance, and that the value of the covenant was $324,100, nearly 85 percent of the $383,400 value petitioner claimed on its return.  Given the inexact science of valuation, we conclude that petitioner is not liable for the addition to tax for negligence.

b.    Valuation Overstatement

Respondent determined that petitioner overstated the value of the covenant by more than 250 percent and asserted the 30 percent addition to tax under section 6659(b) for petitioner's tax year ended June 30, 1989.  A valuation overstatement occurs where the value or adjusted basis of property reported on a tax return is 150 percent or more of the value or adjusted basis that is "determined to be the correct amount".  Sec. 6659(c).

We conclude that the section 6659 addition to tax does not apply to petitioner because 150 percent of the correct value of the covenant ($324,100) is $468,150, and petitioner reported a value of $383,400.

c.    Substantial Understatement

As an alternative to the addition to tax under section 6659, respondent determined an addition to tax for substantial understatement of income tax under section 6661.

Section 6661(a) provides for an addition to tax in the amount of 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. An understatement is the amount by which the correct tax exceeds the tax reported on the return.  Sec. 6661(b)(2)(A). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000.  Sec. 6661(b)(1)(A).

If a taxpayer has substantial authority for the tax treatment of any item on the return, the understatement is reduced by the amount attributable to it.  Sec. 6661(b)(2)(B)(i).  Similarly, the amount of the understatement is reduced for any item adequately disclosed either on the taxpayer's return or in a statement attached to the return. Sec. 6661(b)(2)(B)(ii).

Petitioner argues that it had substantial authority for its position, and that it reasonably relied on its tax advisers for the tax treatment of the covenant not to compete.  Petitioner further argues that respondent should have waived the additions to tax under section 6661.  Vorsheck v. Commissioner, 933 F.2d 757, 759 (9th Cir. 1991).

We think the amount petitioner allocated to Grecco's covenant not to compete was reasonable and that petitioner acted in good faith.  Thus, we find that respondent should have waived the addition to tax for a substantial understatement of income tax.  Id.  Accordingly, we do not sustain respondent's alternative determination as to the addition to tax.

d.   Section 6662(h)

With respect to tax returns due after December 31, 1989, taxpayers are liable for a penalty equal to 20 percent of the part of an underpayment attributable to a substantial valuation misstatement.  Sec. 6662(b)(3).  A substantial valuation misstatement occurs when the value of property claimed on the return is 200 percent or more of the amount determined to be the correct value.  Sec. 6662(e)(1)(A).  Taxpayers are liable for a penalty equal to 40 percent of the part of the underpayment attributable to a gross valuation misstatement.  Sec. 6662(a), (b)(3), (h)(1).  A gross valuation misstatement occurs when the value of property claimed on the return is 400 percent or more of the amount determined to be the correct value.  Sec. 6662(e)(1)(A), (h)(2).

The section 6662(h) penalty does not apply to petitioner for its tax year ending June 30, 1990, because 400 percent of the correct value of the covenant ($324,100) is $1,296,400, and petitioner reported a value of $383,400.

Respondent determined, in the alternative, that the section 6662(a) penalty applies.  Taxpayers are liable for a penalty equal to 20 percent of the part of the underpayment to which section 6662 applies.  Sec. 6662(a).  Section 6662 applies to an underpayment attributable to a substantial understatement of income tax.  Sec. 6662(b)(2).  A substantial understatement of income tax occurs when the amount of the understatement for a taxable year exceeds the greater of 10 percent of the tax required to be shown or $5,000.  Sec. 6662(d)(1)(A).

Petitioner bears the burden of proving that it is not liable for the accuracy related penalty.  Rule 142(a).

The accuracy related penalty under section 6662(a) does not apply to any portion of an underpayment if the taxpayer shows that there was reasonable cause for such portion and that the taxpayer acted in good faith.  Sec. 6664(c)(1).  We consider whether the taxpayer acted with reasonable cause and in good faith based on the facts and circumstances.  Sec. 6664(c)(1).

We conclude that petitioner is not liable for the accuracy related penalty under section 6662(a), because as stated above, petitioner's allocation to the covenant not to compete was reasonable, and petitioner acted in good faith.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.