T.C. Memo. 1997-287


UNITED STATES TAX COURT


CHARLES B. AND TERESA A. THOMPSON, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 5219-95, 5220-95,       Filed June 24, 1997.
16787-95, 16945-95,
16946-95.


<u>John B. Turner</u> and <u>Paul Kingsolver</u>, for petitioners.

<u>Osmun R. Latrobe</u> and <u>Michael J. O'Brien</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>: These cases have been consolidated for

trial, briefing, and opinion. All section references are to the

---

[1] Cases of the following petitioners are consolidated
herewith: State Supply Warehouse Co., Douglas J. Von Allmen, Tax
Matters Person, docket No. 5220-95; Douglas J. and Linda L. Von
Allmen, docket No. 16787-95; Alexa Olson, a Minor, Kimberly
Olson, Legal Conservator, docket No. 16945-95; and Bruce A. and
Kimberly A. Olson, docket No. 16946-95.

Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.  In docket No. 5220-95, respondent issued a notice of final S corporation administrative adjustment (FSAA) to Douglas J. Von Allmen, tax matters person of State Supply Warehouse Co. (State Supply), setting forth the following adjustments with respect to State Supply's 1989 taxable year:

| Item | FSAA Adjustment | Amount in Dispute |
|------|-----------------|-------------------|
| Sales promotion | $7,065 | -0- |
| Covenant not to compete | 673,560 | $673,560 |

During the 1990 tax year, State Supply was an S corporation not subject to the unified audit and litigation procedures of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 402(a), 96 Stat. 324, 648.  All of respondent's adjustments to State Supply flowed directly through to its shareholders' tax returns. Respondent determined the following deficiencies in, and penalty on, petitioners' Federal income tax:

Charles B. and Teresa A. Thompson--docket No. 5219-95

| Year | Deficiency |
|------|------------|
| 1990 | $8,638 |

Douglas J. and Linda L. Von Allmen--docket No. 16787-95

| Year | Deficiency | Accuracy-related Penalty Sec. 6662(a) |
|------|------------|---------------------------------------|
| 1990 | $88,319 | $17,664 |

Alexa Olson, A Minor, Kimberly Olson, Legal Conservator--docket
No. 16945-95

| Year | Deficiency |
| --- | --- |
| 1990 | $3,195 |

Bruce A. and Kimberly A. Olson--docket No. 16946-95

| Year | Deficiency |
| --- | --- |
| 1990 | $55,679 |

Respondent conceded the accuracy-related penalty in docket
No. 16787-95, and petitioner in docket No. 5220-95 has not
argued, and thus conceded, the FSAA adjustment decreasing State
Supply's sales promotion deduction for 1989.  The sole issue for
decision therefore is whether State Supply may amortize $2.5
million, or some lesser amount, for covenants not to compete.

FINDINGS OF FACT

State Supply was incorporated under the laws of the State of
Oklahoma on October 14, 1963.  At the time of the filing of its
petition, State Supply's principal place of business was Tulsa,
Oklahoma.  During the taxable year 1989, State Supply was a
corporation which elected to be taxed for Federal income tax
purposes under the provisions of Subchapter S of the Internal
Revenue Code of 1986, as amended.  For the taxable year 1989,
State Supply is controlled by the TEFRA notice and assessment
procedures provided by sections 6241-6245.  Douglas J. Von Allmen
was the tax matters person for 1989.  During the taxable year
1989, the shareholders of State Supply were Douglas J. and Linda
L. Von Allmen, Bruce A. and Kimberly A. Olson, Charles B. and

Teresa A. Thompson, Alexa Olson, Norman B. and Dale M. Cowgill, Frank J. and Janet F. Andress, and Richard J. and Regina L. Morrison.

Petitioners Charles B. and Teresa A. Thompson are husband and wife and resided in Tulsa, Oklahoma, at the time their petition was filed in this case.

Petitioner Alexa Olson, a minor, Kimberly Olson, legal conservator, is an individual who resided in St. Louis, Missouri, at the time of the filing of her petition herein.

Petitioners Douglas J. Von Allmen (hereinafter referred to as Von Allmen) and Linda L. Von Allmen are husband and wife and resided in Fort Lauderdale, Florida, at the time their petition was filed in this case.

Petitioners Bruce A. Olson and Kimberly A. Olson (hereinafter referred to as Olson) are husband and wife and resided in St. Louis, Missouri, at the time their petition was filed in this case.

State Supply's Business

State Supply was engaged in the distribution of beauty supply products in the States of Oklahoma, Arkansas, Missouri, Kansas, Illinois, Tennessee, Mississippi, Wyoming, Colorado, New Mexico, and Utah, a territory which covered approximately 11 percent of the U.S. population.[2]  State Supply, as a master

---

[2]  Unless otherwise indicated, descriptions pertain to the years in issue.

distributor of beauty supplies, purchased from manufacturers (hereinafter called suppliers) for sale to subdistributors (hereinafter called customers) who then sold to beauty salons and licensed cosmetologists. In 1987, State Supply was one of four such master distributors in the country. At the time of the acquisition, described infra, there were three principal suppliers from which State Supply purchased products: Redken (26 percent of State Supply's sales), Matrix (26 percent of State Supply's sales), and Lamaur Products (19 percent of State Supply's sales). State Supply had distribution agreements with approximately 77 customers, servicing approximately 20,000 beauty salons. Pursuant to distribution agreements between State Supply and its customers, either party to a distribution agreement could terminate the agreement, without cause, by giving 90 days' prior written notice of such termination to the other party. The distribution agreements did not prohibit the customers from buying from other sources.

State Supply's Shareholders

At the time of the acquisition, State Supply had 75,659.61 shares of common stock issued and outstanding. At the time of the acquisition, Robert F. Beaurline, president of State Supply, owned 12,586 shares directly and 3,060.5 shares through his participation in the Employee Stock Option Plan (ESOP), for a total of 15,646.5 shares (approximately 20 percent of all shares). Betty Holliday (hereinafter referred to as Holliday),

chairman of the board of directors of State Supply, owned with her husband Clifford E. Holliday 12,586.26 shares directly and 10,776.60 shares through her participation in the ESOP, for a total of 23,362.86 shares (approximately 30 percent of all shares).

At the time of the acquisition, there were 68 shareholders, including the ESOP, which owned 41,945.35 shares. The 65 shareholders, other than the ESOP, Holliday, and Beaurline, collectively owned 8,342 shares.[3] Most of these shares were owned by customers of State Supply.

Prior Covenant Not to Compete

In December 1984, State Supply purchased the shares held by its previous president and founder of the company, Jim Lewis, for $991,000. They also entered into an agreement and covenant not to compete, for which Lewis was paid $845,000--in addition to the $991,000 paid for his stock--over 5 years.

Group One Capital and Its Principals

Group One Capital, Inc. (Group One), was an investment company specializing in the acquisition of businesses in manufacturing, distribution, servicing, and retailing, generally with sales in the range of $10 to $100 million. Group One was controlled by Von Allmen and Olson.

Von Allmen graduated with an accounting degree from the University of Kentucky, with honors, in 1965. He had experience

---

[3] The breakdown of shares stipulated to by the parties totals only 75,459.

in public accounting with Peat Marwick & Mitchell and other accounting firms. Von Allmen had substantial experience with purchasing, operating, and selling various types of businesses. He had no personal contacts or experience in the beauty supply industry.

Olson had an undergraduate degree from the University of Michigan in economics and a master's degree in business from Columbia University. Olson worked for the Bank of New York for 9 years, part of the time as a vice president. She was the primary person dealing with First National Bank of Cincinnati (the bank) in obtaining the acquisition loan (described infra).

Group One's Offer to Purchase State Supply

In early 1987, Von Allmen received a telephone call from a broker in Springfield, Missouri, advising him that State Supply was for sale. Von Allmen and Olson conducted an investigation and analysis of the financial background of State Supply (the investigation). Based on his experience, Von Allmen believed that the value of State Supply, as a distributor, would be equal to three to five times "trailing earnings", which means the earnings in the prior year. Believing that State Supply was a high risk company, Von Allmen used a multiple in the range of 3-½ to 4 times earnings in determining a price to offer for the shares. Von Allmen learned through the investigation that State Supply had 1986 pretax earnings of approximately $1.5 million. On June 2, 1987, Group One offered in writing (the offer) to

purchase all of the issued and outstanding stock of State Supply for $6 million.

The offer proposed that the stock purchase be accomplished by a cash merger (the acquisition) with a new corporation to be organized by Von Allmen and Olson. There were no provisions for covenants not to compete (sometimes referred to as noncompete agreements) in the offer. The offer provided that State Supply would permit Group One or its advisers full access to all of its properties, books, and records as may be reasonably requested. The acquisition took place on October 29, 1987.

Holliday and Beaurline as Potential Competitors

During their investigation of State Supply, Von Allmen and Olson discovered that Holliday had been with State Supply for 26 years, since its inception and had developed extensive relationships with customers over those 26 years as the "right arm" of the founder of State Supply, Jim Lewis. Holliday had sufficient money to go into competition with State Supply after the sale of her stock to Group One.

During the investigation, Von Allmen discovered that Beaurline had been in the beauty supply business for 36 years, had been with State Supply for 8 years, knew the suppliers and customers very well, was well known in the beauty supply industry, and had served as master of ceremonies for manufacturers' sales meetings and beauty shows.

Prior to joining State Supply, Beaurline held positions with distributors and manufacturers in the beauty supply industry and

had owned a distributorship called Reliable Beauty Supply and a manufacturer's representative business called Robert Beaurline and Associates.  After joining State Supply, Beaurline was involved in marketing, including implementing a monthly marketing publication and an aggressive trade show presence.  He had strong personal relationships with the customers, vendors, and major suppliers.  Beaurline had sufficient money to go into competition with State Supply after the sale of his stock to Group One.

Before the sale of State Supply, if a customer had a serious problem, the customer would call Beaurline or Holliday.  Both Beaurline and Holliday had just bought new houses in the Tulsa area.

## The Acquisition Loan

Group One submitted a loan proposal to the bank.  The bank made the acquisition loan in October 1987.

Steve Kieffner, the vice president in charge of new business development at the bank in 1987, was involved in underwriting the acquisition loan.  As a condition of the acquisition loan, the bank required that Beaurline and Holliday execute noncompete agreements with State Supply.  On September 29, 1987, the bank prepared an internal credit memorandum which analyzed the proposed financing and evaluated the solvency of State Supply after the sale.

## The Noncompete and Employment Agreements

Von Allmen personally invested $300,000 in cash and Olson personally invested $200,000 in cash in the acquisition of State

Supply. Both Von Allmen and Olson personally guaranteed $1 million of the acquisition loan of approximately $4,450,000. After making the offer, Von Allmen and Olson concluded that they had to have noncompete agreements from Holliday and Beaurline in order to lower the risk to their investment. At the time of the acquisition, Von Allmen was "very concerned about what would happen if those two people [Beaurline and Holliday] would ever compete with us, and I felt that I needed strong protection."

Von Allmen obtained legal advice on Oklahoma law regarding the enforceability of noncompete agreements. Von Allmen was advised that under Oklahoma law a company could not prevent competition under a noncompete agreement, but instead could recover the moneys paid for the noncompete agreement. Von Allmen believed that the amounts paid for the noncompete agreements would have to be substantial because that was the only way he could be confident that Beaurline and Holliday would not compete.

Von Allmen believed Beaurline and Holliday could compete with State Supply by setting up another business under another name. Von Allmen had previous experience with a company called Gen-Co Supply Co., where the president and every salesmen quit and set up their own business in competition with their former company. Von Allmen believed that competition from Beaurline and Holliday after the sale would have put State Supply into bankruptcy. Von Allmen determined that "We had absolutely no way to protect ourselves, except to try to put in front of them [Beaurline and Holliday] a non-compete that had enough money in

it that they thought that they had something to risk on the money, and it wasn't worth the time."

On July 13, 1987, Von Allmen wrote identical letters to Beaurline and Holliday proposing that 1-year employment agreements and 5-year noncompete agreements be executed by them concurrently with the purchase of the outstanding shares of State Supply. The agreements stated that the purchase price of the stock was $6 million. Von Allmen proposed that Beaurline and Holliday would each be paid $17,540 per month the first 24 months and $23,040 per month for the last 36 months for a total of $1,250,000 each for the noncompete agreements. The attorneys for the parties to the acquisition, Philip Kaplan (seller's attorney) and Terry Doverspike (buyer's attorney), negotiated the terms of the noncompete agreements in correspondence dated July 30, August 12 and 20, and September 25, 1987. During the course of these negotiations, Kaplan was able to secure a stock pledge agreement and reduce the period of the noncompete agreement from 5 years to 3 years. On October 29, 1987, State Supply and Beaurline and Holliday executed identical documents entitled "Non-Compete Agreement." Under the noncompete agreements, Beaurline and Holliday agreed (among other things) "not to directly or indirectly enter into the business of distributing beauty supplies, or any business or branch of business similar to the type of business conducted by the Employer [State Supply] at the date of this Agreement, within the states of Oklahoma, Arkansas,

Missouri, Kansas, Illinois, Tennessee, Mississippi, Wyoming, Colorado, New Mexico or Utah" for the 3-year period commencing November 1, 1987. No one other than Beaurline and Holliday was offered a noncompete agreement.

Also on October 29, 1987, State Supply executed employment agreements with Beaurline and Holliday. Under the employment agreements, neither Beaurline nor Holliday had the authority or responsibility without prior approval of the board of directors to hire or fire employees, determine employee compensation, or make capital expenditures. The employment agreements could be terminated without cause by State Supply, and specifically acknowledged the existence of the noncompete agreements. The employment agreements provided that:

> The Employee shall devote his entire time, attention and energies to the Employer's business and shall not during the term [one year] of his employment be engaged in any other business activity whether or not such business activity is pursued for gain, profit, or other pecuniary advantage. * * *

State Supply's Deductions for Amortization of Noncompete Agreements

State Supply, on its U.S. Income Tax Return for an S Corporation (Forms 1120S), claimed amortization deductions for the noncompete agreements as follows:

| Taxable Year | Deduction Claimed |
|---|---|
| 1987 | $166,667 |
| 1988 | 958,333 |
| 1989 | 673,560 |
| 1990 | 548,560 |

The Commissioner, in his FSAA Notice for the taxable year 1989, disallowed in full the deductions claimed for amortization of the noncompete agreements.

During the taxable year 1990, all individual petitioners herein owned shares of the outstanding common stock of State Supply.

The Commissioner mailed his notices of deficiency to the individual petitioners for the taxable year 1990, which disallowed in full the amortization deductions claimed for the noncompete agreements.

## Subsequent Events

Prior to the acquisition, Beaurline and Holliday were the president and chairman of the board, respectively, of State Supply.  They continued in their respective offices for 1 year after the acquisition of shares.

Approximately 2 months after the closing, Beaurline approached Von Allmen to request a change in the noncompete agreement so that Beaurline could work for a close friend who owned one of State Supply's major suppliers, Lamaur.  On December 14, 1987, by letter from Terry Doverspike, the noncompete agreement with Beaurline was amended in order to allow him to work for Lamaur.

On February 26, 1991, Holliday died of a heart attack.

## OPINION

The sole issue in this case is how much, if any, petitioners may deduct for the covenants not to compete. Petitioners bear the burden of proof. Rule 142(a).

A taxpayer generally may amortize intangible assets over their useful lives. Sec. 167(a); Citizens & S. Corp. v. Commissioner, 91 T.C. 463, 479 (1988), affd. 919 F.2d 1492 (11th Cir. 1990). To be amortizable, an intangible asset must have an ascertainable value and a limited useful life, the duration of which can be ascertained with reasonable accuracy. Newark Morning Ledger Co. v. United States, 507 U.S. 546, 556 n.9 (1993). A covenant not to compete is an intangible asset that has a limited useful life and, therefore, may be amortized over its useful life. Warsaw Photographic Associates v. Commissioner, 84 T.C. 21, 48 (1985); O'Dell & Co. v. Commissioner, 61 T.C. 461, 467 (1974). We must decide if any of the amount paid for the covenants not to compete was a disguised payment for State Supply's stock.

The amount a taxpayer pays or allocates to a covenant not to compete is not always controlling for tax purposes. Lemery v. Commissioner, 52 T.C. 367, 375 (1969), affd. per curiam 451 F.2d 173 (9th Cir. 1971). We strictly scrutinize an allocation if the parties do not have adverse tax interests because adverse tax interests deter allocations which lack economic reality. Wilkof v. Commissioner, 636 F.2d 1139 (6th Cir. 1981), affg. per curiam

T.C. Memo. 1978-496; Haber v. Commissioner, 52 T.C. 255, 266 (1969), affd. per curiam 422 F.2d 198 (5th Cir. 1970); Roschuni v. Commissioner, 29 T.C. 1193, 1202 (1958), affd. 271 F.2d 267 (5th Cir. 1959). A covenant not to compete must have "economic reality"; i.e., some independent basis in fact or some arguable relationship with business reality so that reasonable persons might bargain for such an agreement. Patterson v. Commissioner, 810 F.2d 562, 571 (6th Cir. 1987), affg. T.C. Memo. 1985-53; Schulz v. Commissioner, 294 F.2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 235 (1960); O'Dell & Co. v. Commissioner, supra at 467-468. We shall first decide, therefore, if the noncompete agreements had "economic reality".

Economic Reality

Courts apply numerous factors in evaluating a covenant not to compete. These include: (a) The grantor's (i.e., covenantor's) having the business expertise to compete; (b) the grantor's intent to compete; (c) the grantor's economic resources; (d) the potential damage to the buyer posed by the grantor's competition; (e) the grantor's contacts and relationships with customers, suppliers, and other business contacts; (f) the duration and geographic scope of the covenant; (g) enforceability of the covenant not to compete under State law; (h) the age and health of the grantor; (i) whether payments for the covenant not to compete are pro rata to the grantor's stock ownership in the company being sold; (j) whether the payments under the covenant not to compete cease upon breach of

the covenant or upon the death of the grantor; and (k) the existence of active negotiations over the terms and value of the covenant not to compete. Molasky v. Commissioner, 897 F.2d 334, 337 (8th Cir. 1990) affg. in part and revg. in part T.C. Memo. 1988-173; Warsaw Photographic Associates, Inc. v. Commissioner, 84 T.C. 21 (1985); Furman v. United States, 602 F. Supp. 444 (D.S.C. 1984) affd. without published opinion 767 F.2d 911 (4th Cir. 1985); see Beaver Bolt, Inc. v. Commissioner, T.C. Memo. 1995-549 and cases cited therein.  a.  Grantor's Business Expertise

Respondent concedes that Holliday and Beaurline had considerable experience in the beauty supply business.  The record is replete with evidence that Holliday and Beaurline had the business experience necessary to compete effectively.

b.  Grantor's Intent to Compete

Beaurline and Holliday discussed whether they should agree to covenants not to compete.  They decided that noncompete agreements would be acceptable only if the "price was right" for removing themselves from the beauty supply business for 5 years. Beaurline credibly testified that he probably would have gone back into the beauty supply business after the sale of State Supply.

c.  Grantor's Economic Resources to Compete

Holliday received approximately $1,850,000 and Beaurline approximately $1,240,000 from their sale of stock in State

Supply. Based upon our review of State Supply's business, its tax returns, and financial statements, we find that the above amounts would have been sufficient to enable either Holliday or Beaurline to compete against State Supply.

### d. Potential Damage to the Buyer Posed by the Grantor's Competition

Due to the nature of State Supply's business (buying finished products from a small number of suppliers and reselling them to an established group of 77 customers without adding value), strong relationships with the four major suppliers and the customers were crucial to the company's success. Holliday and Beaurline had such relationships, and the buyers did not. Von Allmen reasonably believed that Holliday and Beaurline could have put State Supply into bankruptcy had they competed. We find that both Holliday and Beaurline possessed the ability to take a significant portion of State Supply's business.

### e. Grantor's Contacts and Relationships with Customers, Suppliers, and Other Business Contacts

It would be difficult to imagine grantors with stronger contacts and relationships with suppliers and customers. Indeed, respondent concedes that grantors had good rapport with the suppliers and subdistributors.

### f. Duration and Geographic Scope

Holliday's and Beaurline's covenant applied to competition in the 11 States where State Supply conducted business for a

period of 3 years. We find that these limits were reasonably drawn to keep them from competing with State Supply.

g. Enforceability Under State Law

The buyers were told by their attorney that the covenants would be virtually nonenforceable in equity and that their only recourse would be to obtain a refund of the moneys paid for the covenants. Respondent admits on brief that State law provided such a remedy.

h. Age and Health of Grantors

Respondent concedes that Holliday and Beaurline had no apparent health problems. Their age is not in the record.

i. Whether Payments Were Pro Rata to the Grantors' Stock Ownership

Although Holliday owned approximately 50 percent more stock than Beaurline, she received the same amount under the noncompete agreements as Beaurline. These non-pro rata payments indicate that something other than stock was purchased.

j. Whether Payments Cease Upon Breach or Upon the Death of a Grantor

The noncompete agreements called for payments to be made into escrow in the event of the grantors' breach. However, the payments were to be continued upon the death of a grantor. This factor supports respondent.

k. Active Negotiations Over Terms and Value

There were active negotiations over the terms of the covenants; the term was lowered from 5 to 3 years. The value of

the covenant does not appear to have been the subject of negotiation.

Based upon the above analysis, we hold that the noncompete agreements had economic reality; the evidence on this point on petitioners' behalf is overwhelming.

Value of the Noncompete Agreements

The parties each called expert witnesses to give their opinions about the value of the covenants. As the trier of fact, we must weigh the evidence presented by the experts in light of their demonstrated qualifications in addition to all other credible evidence. Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970). However, we are not bound by the opinion of any expert witness when that opinion is contrary to our judgment. Estate of Kreis v. Commissioner, 227 F.2d 753, 755 (6th Cir. 1955), affg. T.C. Memo. 1954-139; Chiu v. Commissioner, 84 T.C. 722, 734 (1985). We may accept or reject expert testimony as we find appropriate in our best judgment. Helvering v. National Grocery Co., 304 U.S. 282, 294-295 (1938); Seagate Tech., Inc. & Consol. Subs. v. Commissioner, 102 T.C. 149, 186 (1994).

a. Respondent's Expert

Respondent's expert, Paul H. Meade, is a valuation engineer for the Internal Revenue Service (IRS) and a registered professional engineer licensed in the State of Oklahoma. He has

a bachelor of science degree in industrial engineering from Oklahoma State University.

Mr. Meade concludes that the covenants had, at best, a nominal value. Mr. Meade first valued State Supply by using a discounted future earnings method which calculates the present value of a base level of earnings. The starting point for Mr. Meade's calculation is the base level of earnings of $850,000, which he took from the initial credit memorandum prepared by the bank. The base number is not an historical earnings number but simply the "base level of return * * * which was required by financial institution [sic]" in order to make the acquisition loan to the buyers. Mr. Meade does not tell us why this number has any significance or why it should form the basis of his calculations. Mr. Meade concludes that State Supply's discounted future earnings stream is worth $7,208,000. He then adds to that number the amount of State Supply's cash or cash equivalents in excess of the amount deemed needed for this type of business ($1.4 million) and arrives at a rounded value of $8.6 million as the fair market value of State Supply. Mr. Meade's entire analysis of the covenants' value is as follows:

> Consideration of the allocation to the covenants in regard to the fair market value of the stock [value of State Supply] when the net price paid for both stock and covenant[s] is $6.8 million [Mr. Meade's calculation of the cash required to purchase the stock and the discounted cost of the covenants] leaves, at best, a nominal value for allocation to the covenants.

b.  Petitioners' Expert

Petitioners' expert, Mark L. Mitchell, is a principal in Business Valuation Services, Inc.  He holds a master of business administration degree in finance and bachelor of science degrees in mathematical sciences and economics and systems analysis, all from Southern Methodist University.  He is a member of the Association for Investment Management and Research, a member of the Dallas Association of Investment Analysts, and a senior member of the American Society of Appraisers.

Mr. Mitchell utilized a discounted cash-flow model to determine the value of State Supply assuming the presence of the noncompete agreements.  He concludes that State Supply is worth $8,516,931.  Both parties' experts agree on the value of State Supply with the covenants in place.[4]

To value the noncompete agreements, Mr. Mitchell calculated the value of State Supply without them and subtracted that value from the previously determined value of State Supply with the noncompete agreements.  In order to calculate the value of State Supply without the noncompete agreements, Mr. Mitchell made assumptions concerning the impact that competition from Holliday and Beaurline would have and the probability of that competition

[4]  By using the bank's base level of return number of $850,000 (a number the bank calculated assuming the existence of the noncompete agreements), respondent's expert has, perhaps inadvertently, valued State Supply with the noncompete agreements in place.

taking place in each of the first 3 years after the sale. The end result was that Mr. Mitchell valued the noncompete agreements, in the aggregate, at $2,464,752, which he rounded up to $2.5 million.

Effect of Employment Agreements on Valuation

Respondent's main argument[5] against the petitioners' expert valuation of the noncompete agreements is that the employment agreements entered into by Holliday and Beaurline effectively prevented any possibility of competition for the year they were in effect. Once the possibility of competition is eliminated for the first year after the sale, respondent argues that even petitioners' expert calculations would only support a value of $400,000 for the noncompete agreements (the highest risk of competition coming in the first year after the sale). Respondent is mistaken.

We dealt with this argument in Peterson Mach. Tool, Inc. v. Commissioner, 79 T.C. 72, 85 (1982) affd. 54 AFTR 2d 84-5407, 84-2 USTC par. 9885 (10th Cir. 1984):

> The fact that Moses [grantor of the covenant] signed an employment contract with Peterson, Inc., for the duration of his covenant not to compete is entitled to weight, but is not determinative. Maseeh v. Commissioner, 52 T.C. 18, 23 (1969). There was always

---

[5] Incredibly, respondent argues that petitioners' expert report should be ignored since it "was prepared for tax purposes and for this specific litigation." We should hope so. See Rule 143(f). Respondent's expert report was prepared under like circumstances.

> the possibility that Moses or Peterson, Inc., could breach the employment contract or that Moses could be terminated for cause. In either case he could, absent a covenant not to compete, have engaged in competition. Furthermore, the fact that the employment contract contained its own restrictive covenant is of no moment since Moses testified that the employment contract and covenant not to compete were both part and parcel of the stock-sale transaction.

We find that the noncompete agreements and the employment agreements, which were entered into at the same time and refer to each other, are "part and parcel of the stock-sale transaction." We shall give the existence of the employment contracts some weight in our considerations but, contrary to respondent's arguments, they are not determinative in considering the possibility of competition in the first year.

Conclusions as to Value

We found respondent's expert report to be of no assistance. We agree with the criticisms contained in petitioners' expert rebuttal reports[6] that, among other deficiencies, Mr. Meade's expert report (a) treated the cash equivalents in State Supply inconsistently, including them for valuation purposes but excluding them when calculating the net price paid by the buyers; and (b) contains no analysis of the factors to be considered in valuation of noncompete covenants, as detailed in respondent's Rev. Rul. 77-403, 1977-2 C.B. 302. Moreover, Mr. Meade's

---

[6] Mr. Mitchell prepared a rebuttal report as did Wendy E. Sharon, a manager in the Valuation Services Group at Coopers & Lybrand L.L.P.

"method" of valuing the noncompete agreements, comparing the "net price paid" for the stock and the noncompete agreements to the value of State Supply, is highly suspect. Mr. Meade offers no explanation or rationale for his methodology, nor can we provide any.

Mr. Meade's report, as well as respondent's arguments, that the noncompete agreements had nominal value, are antithetic to common sense. The factors detailed above, when we analyzed whether the noncompete agreements had economic reality, overwhelmingly establish a strong need, and a corresponding high relative value, for the noncompete agreements.

We found petitioners' expert report to be helpful, as it used a methodology for valuing the noncompete agreements that was clear and logical. See International Multifoods Corp. v. Commissioner, 108 T.C. ___ (1997). More importantly, we believe the record shows that competition from Beaurline and Holliday could have destroyed State Supply. Based on the record as a whole, considering all of the facts and circumstances, we hold that petitioners have met their burden of showing that the noncompete agreements were worth at least $2.5 million.

To reflect the foregoing,

Decisions will be entered

for petitioners in docket Nos.

5219-95, 16787-95, 16945-95, and 16946-95.

Decision will be entered under Rule 155 in docket No. 5220-95.