T.C. Memo. 1997-448


UNITED STATES TAX COURT


DHARMA ENTERPRISES, Petitioner <u>v.</u> COMMISSIONER
OF INTERNAL REVENUE, Respondent


Docket No. 16756-95.                    Filed September 30, 1997.


<u>Charles W. Tuckman</u>, <u>Richard A. Saffir</u>, and <u>Robert C.</u>
<u>Alexander</u>, for petitioner.

<u>James P. Thurston</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>:  Respondent determined deficiencies in
petitioner's Federal income tax and accuracy-related penalties
under section 6662(a)[1] for taxable years ending May 31 as
follows:

---

[1] Unless otherwise indicated, all section and subchapter
references are to the Internal Revenue Code in effect for the
years in issue, and all Rule references are to the Tax Court
Rules of Practice and Procedure.

| Year | Deficiency | Penalty |
|------|-----------|---------|
| 1991 | $209,006 | $41,801 |
| 1992 | 192,075 | 38,415 |
| 1993 | 204,804 | 40,961 |

After concessions, the issues for consideration are: (1) Whether the royalties paid to Dharma Mudranalaya for certain intangible assets were reasonable in amount, (2) whether petitioner is entitled to deduct net operating loss carryovers in taxable years 1991 and 1993, (3) whether petitioner must increase gross sales by $7,095 in taxable year 1992, and (4) whether petitioner is liable for a section 6662(a) accuracy-related penalty for each of the years in issue.

## FINDINGS OF FACT

Petitioner had its principal place of business in Oakland, California, at the time the petition in this case was filed. Petitioner operates a sheet-fed, lithographic commercial printing business and provides typesetting, prepress, printing, and binding services. Petitioner also prints religious calendars, postcards, and greeting cards through its Amber Lotus division.

Petitioner claimed deductions under section 162(a) for the payments to Dharma Mudranalaya (DM), a related entity, pursuant to a license agreement for certain intangible assets in taxable years ending May 31 as follows:

| Year | Deduction Claimed |
|------|-------------------|
| 1989 | $648,000 |
| 1990 | 785,000 |
| 1991 | 680,817 |
| 1992 | 854,840 |
| 1993 | 788,189 |

Deductions claimed by petitioner in 1989 and 1990 produced net operating losses (NOL's) of $55,918 and $26,854, respectively, which petitioner carried forward to 1991. Similarly, petitioner claimed deductions in 1992 that resulted in an NOL of $4,957, and petitioner carried forward the NOL to 1993. Respondent disallowed the deductions as in excess of fair market royalties for the licensed assets. Petitioner reported taxable income for the taxable years in issue of:

| Year | Taxable Income |
|------|----------------|
| 1991 | $200,338 |
| 1992 | (4,957) |
| 1993 | 115,160 |

Petitioner was incorporated in June 1987 as a nonprofit mutual benefit corporation under the nonprofit mutual benefit corporation law of the State of California. Cal. Corp. Code sec. 7110 (West 1990). It is a taxable subchapter C corporation for Federal income tax purposes but has not issued any capital stock. Petitioner's profits are to be used for a common purpose of its members, who do not personally benefit from its profits. Petitioner's articles of incorporation provide that petitioner was formed "to contribute financially and in other ways to the activities and welfare of non-profit organizations dedicated to the transmission and preservation of the Buddha Dharma". Despite petitioner's stated purpose, petitioner has not made a charitable contribution to a Buddhist organization since its inception. A secondary purpose of petitioner is to provide a work environment in which to practice Buddhist principles.

Petitioner is part of a network of organizations established under the leadership of Tarthang Tulku (Tulku), a Buddhist lama with active lineage of the Nyingma school of Tibetan Buddhism. The organizations are dedicated to the preservation of Tibetan Buddhism and include, among others: (1) DM, (2) the Tibetan Nyingma Meditation Center (Meditation Center), (3) the Nyingma Institute in Berkeley, California, and a branch campus in Boulder, Colorado, and (4) Nyingma Centers Corp. (collectively Nyingma organizations or Dharma organizations). Individuals associated with these organizations are referred to as the Nyingma community; i.e., individuals who practice and/or are interested in the teachings of the Nyingma school of Tibetan Buddhism.

Tulku has adapted Tibetan Buddhist teachings for the West. The Nyingma community refers to the practice of Buddhist teachings, or Dharma, in the West as "skillful means". In 1978, Tulku wrote a book titled Skillful Means, which describes the practice of Buddhist teachings in everyday life. Skillful means, as taught by Tulku, involves work as a spiritual practice with certain spiritual value. The book suggests that the application of Buddhist principles enables individuals to become more successful in their work, which makes work more satisfying and meaningful. The Nyingma Institute offers classes in skillful means.

DM prints and publishes rare Tibetan Buddhist texts and art. DM's goals are to preserve traditional Tibetan Buddhist texts, to

transmit Buddhist teachings in the West, and to provide a work setting in which to practice Buddhist teachings. DM was a section 501(c)(3) organization for Federal tax purposes from December 1, 1987 to November 30, 1992. From its inception in 1975 to 1985, DM was also engaged in the commercial printing business. In 1985, employees of DM who were members of the Nyingma community formed Skillful Means Enterprises, also known as Skillful Means Press (SMP), to take over DM's commercial printing business, and DM ceased its commercial printing operations. Most of SMP's employees were members of the Nyingma community. DM provided a startup loan and rented printing equipment and building facilities to SMP. DM intended that SMP would not own any assets. DM also licensed the right to use certain intangible assets, including the name "skillful means", to SMP in exchange for royalties.

A member of the Nyingma community, Arnaud Maitland (Maitland), formed petitioner in June 1987 to provide binding services to SMP. Maitland earned a master's degree from the Nyingma Institute and served as its dean from 1980 to spring 1987, first at its Boulder campus and then in Berkeley. Maitland has taught classes at the Nyingma Institute, including classes in skillful means. He lived at the Nyingma Institute for rent of $200 per month. Maitland was petitioner's chief executive officer.

One month after petitioner's incorporation, in July 1987, DM notified SMP that its license and rental agreements would

terminate in March 1988. DM terminated the agreements in part because SMP had been behind on the royalty payments since its inception. DM terminated SMP's license even though SMP had become a profitable business and was growing rapidly. In 1987, SMP had over $2.8 million in gross sales. Petitioner's ability to take over SMP's printing business also instigated DM's decision to terminate SMP's license.

DM immediately entered into negotiations with petitioner for the license of intangible assets and the sale of printing equipment. DM did not contact any other party regarding the license. Maitland represented petitioner in the license negotiations. Jack Petranker (Petranker) negotiated the license agreement for DM. Petranker was a director and officer of DM and replaced Maitland as dean of the Nyingma Institute. Petranker, who had a law degree, prepared and filed the articles of incorporation for petitioner and signed as petitioner's sole incorporator. Petranker is not involved in petitioner's business operations. Petranker also lent petitioner startup capital. In March 1988, petitioner owed over $70,000 to Petranker.

When he formed petitioner, Maitland did not have any experience in the printing industry. Maitland began working at SMP as a production manager, without compensation, in July 1987 to learn about the printing business. SMP allowed Maitland to work for it despite the fact that DM planned to enter into a license agreement with petitioner. Maitland relied on SMP's business plans to determine petitioner's expected profits and did

not prepare his own business plans.  Maitland also examined SMP's financial information and met with SMP's customers and suppliers and with industry experts to determine SMP's production capacity and profitability.  SMP also trained petitioner's newly hired employees.  Several months after SMP provided this assistance to petitioner, a merger of petitioner and SMP was proposed.

The merger occurred upon the termination of SMP's license and rental agreements with DM.  Petitioner remained as the surviving corporation.  All of SMP's members became members of petitioner, and three became directors of petitioner.  In addition, the majority of SMP's employees began working for petitioner.  Petitioner took over SMP's printing business and completed SMP's work in progress.  Pursuant to the merger agreement, petitioner assumed all of SMP's assets and liabilities, including a $70,000 loan from Petranker.

Petitioner and DM entered into a sales agreement for the printing equipment in November 1987 and a license agreement in December 1987 to become effective at the termination of SMP's license and rental agreement.  The parties amended the license agreement on two occasions.[2]  First, they amended the license in 1989 to list the licensed assets and clarify the terms of the original license agreement.  Second, they amended the license in

_____

[2]  The stipulation of facts provides that the license agreement was amended on three dates:  June 1, 1989, Jan. 25, 1990, and Feb. 1, 1990.  The Jan. 25, 1990, and Feb. 1, 1990, amendments are similar in substantive terms, and both reduce the royalty payments in equal amounts.  For our convenience in this opinion, we refer to the Jan. 25, 1990, and Feb. 1, 1990, amendments as one amendment.

1990 to reduce the amount of the royalty payments. When petitioner and DM amended the license agreement, they were represented by the same attorney who worked for the various Nyingma organizations.

The license agreement, as amended, granted to petitioner the right to use the name "Dharma" and the trade names "Dharma Enterprises", "Skillful Means Press", "Amber Lotus", and "Dharmart Designs". Tulku personally approved petitioner's use of "Dharma" in its name. DM has not registered any of these trade names or the name Dharma as trademarks with either the Federal or State government. The license provides that petitioner's Dharma name identifies it as an approved Dharma organization. Members of the Nyingma community and the Nyingma organizations recognize petitioner as a Dharma organization. Petitioner also licenses a moon/cloud logo, which DM designed at petitioner's request.

Pursuant to the amended license agreement, petitioner received the right to "Certain proprietary Know-How, including DM's expertise, [and] management techniques * * * for achieving increased production and efficiency with a minimal workforce" and the right to market this management technique. Petitioner referred to this licensed asset as skillful means management technique (SMMT).[3] SMMT involves the application of Dharma

---

[3] Use of "skillful means management technique" and SMMT does not express any decision with regard to DM's proprietary interests in the materials pertaining to Buddhist principles given to petitioner or the value of those materials.

principles in a business setting and is derived from the principles set forth in the 1978 "Skillful Means" book. Petitioner refers to "Skillful Means" as a general introduction to the practice of Dharma and the licensed SMMT as an advanced version. SMMT focuses on three distinct aspects of human nature to make work more successful and more satisfying: Awareness, concentration, and energy. Employees record their level of each of these three resources, such as low, medium, or high, during different times of the workday. Then they graph the results in order to determine which of the three resources supports their work activity, their state of mind, and their ability to communicate and cooperate with coworkers at the different periods of the day. Employees engage in this exercise to become more productive and efficient in their work. In addition, they attempt to determine the amount of time and energy wasted during work hours from thinking about things unrelated to their jobs.

Petitioner hired employees who were interested in practicing Buddhist principles in a commercial work setting and who wanted to work for a company whose profits were used to preserve Tibetan Buddhist texts and art. Approximately 30 percent of petitioner's 75 employees practiced SMMT in their work (Nyingma employees). Petitioner's Nyingma employees did not have prior experience in the printing business, except for the employees who had worked at SMP. Nyingma employees had practiced skillful means, or Buddhist teachings, in previous jobs, read Tulku's "Skillful Means", and taken skillful means classes at the Nyingma Institute before

coming to work for petitioner. Petitioner also hired employees with printing experience who did not practice Tibetan Buddhist teachings at work (non-Nyingma employees).

DM provided manuals and essays on SMMT to petitioner and consulted with petitioner regarding the practice of SMMT by petitioner's employees. Petitioner held weekly classes on SMMT for its Nyingma employees. At the classes, Nyingma employees discussed their own experiences with SMMT in their work. Nyingma employees also participated in individual discussions with each other regarding their work experiences. Petitioner and the Nyingma Institute subsidized the costs of classes that Nyingma employees took at the Nyingma Institute. Petitioner did not distribute the SMMT manuals that it received from DM to nonmanagerial personnel. It did hand out SMMT pamphlets and essays to Nyingma employees during class. Nyingma employees were asked not to photocopy the materials and were required to return them at the end of the class.

Petitioner paid its Nyingma employees significantly less than it paid non-Nyingma employees with similar responsibilities. Nyingma employees generally made less than $5 per hour, while non-Nyingma employees made from $15 to $25 per hour. The wages of petitioner's Nyingma employees were below the average wage of nonunion employees in the printing industry in Northern California. Nyingma employees worked at least 60 hours per week, while non-Nyingma employees worked 40 hours a week. Also, Nyingma employees had low absenteeism and low turnover as

compared with non-Nyingma employees. Many of the Nyingma employees lived at the various Nyingma organizations. Petitioner estimated that it saved over $500,000 a year in labor costs because of Nyingma employees' below-market wages and efficiency.

During the years in issue, SMMT was continually being developed and revised. Petitioner contributed to these revisions by sharing its experiences with the use of SMMT. Tulku wrote some of the SMMT materials. Maitland wrote an article about his experiences with SMMT that became part of the SMMT materials given to petitioner under the license. In 1994, DM published "Mastering Successful Work", written by Tulku, as a sequel to the 1978 "Skillful Means". "Mastering Successful Work" is related to SMMT and is based on the SMMT materials transmitted to petitioner under the license agreement. Members of the Nyingma organizations, other than petitioner, also applied Dharma in their work. For example, Maitland practiced Dharma principles as dean of the Nyingma Institute, and employees of SMP had also practiced skillful means, which SMP had licensed from DM. SMMT materials have been given to at least one other Nyingma organization which did not have a license agreement with DM or pay either petitioner or DM for use of the materials. During the years in issue, petitioner did not market SMMT. In 1995, petitioner held a 5-day seminar on SMMT, earning $7,500.

As part of the 1990 amendment to the license agreement, DM also agreed not to compete with petitioner in the commercial printing industry for 5 years and to refer commercial customers

to petitioner.  In addition, the amended license agreement granted to petitioner the right to two computer software programs, including software that prepares price estimates for printing jobs.  An employee/director of petitioner updated the computer software as necessary.  Petitioner did not solicit bids for the computer software from other companies before licensing it from DM.

Petitioner also received a list of DM's commercial customers from its 1985 business.  Neither the original license agreement nor the subsequent amendments specifically identified a customer list as a licensed asset.  However, both parties understood and intended that the agreement conveyed to petitioner the right to use DM's customer list.  DM had previously licensed the same customer list to SMP in 1985.  When SMP's license terminated, DM's 1985 customer list reverted to DM pursuant to the license agreement.

Petitioner was formed without any capital contribution from its members and primarily relied on DM, other Nyingma organizations, and members of the Nyingma community for financing.  DM and another Nyingma entity financed petitioner's purchase of the printing equipment.  Petitioner borrowed money from the Nyingma Institute and from various individuals, including Petranker, for startup capital.  Petitioner also received favorable credit terms from suppliers that enabled it to start business with capital contributions from its members.  In 1989, DM and the Meditation Center financed petitioner's purchase

of a $1 million, four-color printing press. The purchase of the four-color press prompted petitioner and DM to amend the license agreement to reduce the amount of the royalty payments. An unrelated bank denied petitioner a loan for this press unless the royalty payments were decreased. Although petitioner borrowed the money from DM and the Meditation Center instead of the bank, petitioner and DM still decreased the royalties to ensure that petitioner would be able to repay the loan.

Tulku serves as honorary chairman of petitioner's board of directors. Petitioner views Tulku's chairmanship as a public endorsement of petitioner as a Nyingma organization. Petitioner paid the following amounts to Tulku for his chairmanship in taxable years ending May 31:

| Year | Compensation |
|------|--------------|
| 1991 | $25,440 |
| 1992 | 26,140 |
| 1993 | 26,640 |

Tulku is not active in petitioner's business operations and has never attended a board meeting. However, Tulku frequently discusses SMMT with Maitland.

During the years in issue, all of petitioner's directors were associated with, had studied and practiced, or were interested in, the Nyingma school of Tibetan Buddhism and the general Buddhist teachings known as Dharma. In addition, most of petitioner's directors lived at the various Nyingma organizations. DM and petitioner had two common directors. Two of petitioner's directors, one of which was Maitland, served as directors of the Nyingma Centers Corp., an umbrella corporation

which oversees and coordinates the activities of the various Nyingma organizations. Two directors, including Maitland, had taught skillful means classes at the Nyingma Institute and served as its dean.

Petitioner's market for its commercial printing business, with the exception of the Amber Lotus division, encompassed the greater San Francisco Bay Area. It did not advertise its commercial printing business and primarily relied on customer referrals and cold calls to obtain new customers. Petitioner had a reputation as a high-quality, low-priced printer that provided good customer service. Petitioner's Amber Lotus division advertised through a variety of methods. The Amber Lotus division accounted for approximately 7 percent of petitioner's gross sales during the years in issue. Amber Lotus was started by DM in 1986.

In taxable year 1991, petitioner reported gross sales of $6,239,139 on its tax return. Respondent determined that petitioner underreported its gross sales by $8,301. Petitioner concedes an increase in its gross sales of $1,206. Petitioner reported gross sales of $7,095 less than reflected on its books and records because petitioner double counted sales on its books and records by this amount. Petitioner had issued two invoices to a customer for the same print job and recorded both invoices as gross sales on its books and records. The customer paid both invoices and then informed petitioner about the overbilling.

Petitioner issued a credit to the customer in the amount of $7,095 to adjust for the prior overbilling.

OPINION

The primary issue for our consideration is whether petitioner's royalty payments to DM were reasonable in amount. To the extent petitioner's payments to DM are disallowed as royalties, petitioner argues that it is entitled to deduct the payments under section 162 as payments to a charitable organization in expectation of commensurate financial benefit.

Taxpayers are entitled to deduct royalty expenses incurred in carrying on a trade or business that are reasonable in amount under section 162(a)(3). Sierra Club Inc. v. Commissioner, 86 F.3d 1526, 1531 (9th Cir. 1996), affg. in part and revg. in part 103 T.C. 307 (1994); Surloff v. Commissioner, 81 T.C. 210, 232 (1983); Differential Steel Car Co. v. Commissioner, 16 T.C. 413, 423 (1951). Reasonableness is a question of fact to be determined from all the facts and circumstances. Petitioner bears the burden of proving the reasonableness of royalty payments. Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Respondent agrees that petitioner may deduct the royalty payments under section 162(a)(3) to the extent they were reasonable.

Royalty payments between related parties require special scrutiny to determine whether they are reasonable in amount. Royalty payments are reasonable if an unrelated third party dealing at arm's length would have agreed to the payments.

Merritt v. Commissioner, 39 T.C. 257, 270 (1962), revd. on another issue sub nom. Paragon Jewel Coal Co. v. Commissioner, 330 F.2d 161 (4th Cir. 1964), revd. 380 U.S. 624 (1965); Belknap v. Commissioner, T.C. Memo. 1989-210. Typically two parties are considered closely related if they have common owners. However, petitioner is a nonprofit corporation under the laws of the State of California and does not have shareholders. Nevertheless, we find that petitioner is closely related to DM for Federal income tax purposes and that petitioner and DM did not negotiate the amount of the royalty payments at arm's length.

Petitioner and DM have a common purpose, to preserve Tibetan Buddhism. Petitioner's payments to DM satisfy its stated purpose to financially support the Buddha Dharma. Petitioner has a tax incentive to characterize the payments to DM as fully deductible royalties as opposed to charitable contributions for which deductions are limited under section 170. DM also benefits from the relationship because it received the profits from a commercial printing business while minimizing the risks to its tax-exempt status. Ordinarily, a common purpose between two charitable or religious organizations will not result in a finding that the two entities are closely related for tax purposes, subjecting their transactions to close scrutiny by a court with regard to the reasonableness of transactions between them. Based on the facts and circumstances of this case, we find that petitioner and DM are closely related parties and used that relationship to claim excessive deductions that are not justified

by business reality. In such circumstances, it is appropriate for us to consider the relationship between a religious organization and its members.

Maitland, petitioner's founder and chief executive officer, had a longstanding, close relationship with the various Nyingma organizations. Maitland studied at the Nyingma Institute, served as its dean, taught classes there, and lived at the school. Maitland was also a director of Nyingma Centers Corp. In addition, Petranker, who negotiated the license for DM, had ties to petitioner. He prepared its articles of incorporation and acted as the sole incorporator. Petranker also lent startup capital to petitioner so that its founders did not have to make capital investments. In 1988, petitioner owed over $70,000 to Petranker. Moreover, all of petitioner's nine directors were members of the Nyingma community and subscribed to the teachings of the Nyingma school of Tibetan Buddhism. Petitioner's directors also served as directors of the other Nyingma organizations, lived in the Nyingma housing, were deans of the Nyingma Institute, and had taught courses there. In addition, Maitland recruited employees for petitioner from the classes he taught at the Institute.

The manner in which petitioner and DM conducted the license negotiations raises suspicion and leads to a finding that arm's-length bargaining did not exist. Maitland did not prepare a business plan and relied on plans and sales projections prepared by SMP. Petitioner received valuable assets from DM, including

trade names and trademarks, SMMT, the right to commercially market SMMT, two computer software programs, DM's customer list, and a covenant not to compete. However, there is no evidence that petitioner attempted to derive a monetary value for the licensed assets before entering into negotiations and simply wanted to pay the same amount of royalties that SMP paid. Maitland admitted that he was careless in drafting and reviewing the written agreement. He omitted the most important licensed asset, SMMT, from the original license agreement and omitted the customer list from both the original and amended agreements. DM did not contact any interested third party to discuss possible licensing of the intangible assets. In addition, petitioner and DM were represented by the same attorney when they amended the license agreement.

The financing that petitioner received from the various Nyingma organizations also indicates that a close relationship existed between petitioner and DM as two entities within a larger network of Nyingma organizations. The Nyingma Institute lent money to petitioner. DM along with other Nyingma organizations financed petitioner's initial purchase of printing equipment and the purchase of the four-color press in 1989.

Petitioner took SMP's place within the Nyingma network, and SMP assisted petitioner in entering into the printing business. SMP permitted Maitland to work there and also trained petitioner's newly hired employees. Maitland relied on SMP's business plans and profit projections rather than preparing his

own. SMP provided this assistance before the merger with petitioner was proposed and with the knowledge that petitioner would be taking over its terminated license. SMP was run by members of the Nyingma community and controlled by DM and the other Nyingma organizations. The assistance that petitioner received from SMP supports a finding of a close relationship between DM and petitioner.

Petitioner wants to appear as an entity independent from DM with its own desire to earn a profit. However, petitioner constantly paid the majority of its after-tax profits to DM and even sustained an after-tax loss during one of the years in issue. Moreover, after petitioner paid its profits to DM, it had to go to DM and another Nyingma organization for financing when it needed a new printing press to stay competitive in the industry. Petitioner dedicated its profits to benefit Buddhist culture and traditions. It made no difference to petitioner whether it paid large or small royalties to DM because the profits given to DM would be used for these purposes. Because of the close relationship between petitioner and DM, we find that the license agreement was not the result of arm's-length bargaining.

The determination of the amount of reasonable royalties in this case requires two lines of inquiry: (1) What assets did petitioner license from DM, and (2) what is the value of the licensed assets? Both parties presented expert witnesses regarding the value of the license agreement. We are not bound

by the opinion of any expert witness when the opinion is contrary to our judgment. Chiu v. Commissioner, 84 T.C. 722, 734 (1985). We may accept or reject expert testimony as we find appropriate. Helvering v. National Grocery Co., 304 U.S. 282, 294-295 (1938); Seagate Tech., Inc. & Consol. Subs. v. Commissioner, 102 T.C. 149, 186 (1994).

Petitioner's expert report was prepared by Peterson Consulting L.L.C. (Peterson Consulting). Mr. Philip Rowley (Rowley), a vice president of Peterson Consulting, testified at trial regarding his company's valuation of the license. Peterson Consulting applied an incremental profit method to value the license. For the valuation, Peterson Consulting included the following assets as being part of the license agreement: Trade names, trademarks and logos, SMMT, the right to market SMMT, computer software, and certification as a Dharma/Nyingma organization. Peterson Consulting also considered DM's covenant not to compete in its evaluation of the license.

Under the incremental profits method, Peterson Consulting estimated petitioner's profits with and without the licensed assets. It attributed the difference between the two, or incremental profits, to the value of the licensed assets. It adjusted the value for applicable taxes and discounted it to present value. Peterson Consulting valued petitioner's business, as of the 1990 amendment, with the license at $5,611,392 and without the license at $439,970 for incremental profits from the

license of $5,171,422.  It determined that the pretax, present value of the license was $1,411,480 per year.

Peterson Consulting considered SMMT to be the majority of the license's value and identified below-market labor costs and employee productivity as two benefits of SMMT.  To measure the value of SMMT, Peterson Consulting compared petitioner's total labor costs as a percentage of its gross sales with the industry average labor costs-to-gross sales for sheet-fed printers with similar gross sales from the Printing Industries of America, Inc. (PIA) annual reports.  In 1989 and 1990, petitioner's labor costs-to-gross sales ratio was 21.36 percent, while the PIA industry ratio was 38.38 percent.  According to Peterson Consulting, the 17.02-percent difference produced labor cost savings for petitioner in 1989 and 1990 of $1,548,714.  Peterson Consulting did not include payroll taxes, worker compensation insurance costs, and vacation wages as part of petitioner's labor costs and overstated petitioner's labor costs savings.

Peterson Consulting also assessed the value of SMMT by comparing petitioner's sales-to-assets ratio with the PIA industry average.  According to Peterson Consulting, the sales-to-assets ratio measured petitioner's productivity.  It determined that petitioner's gross sales-to-net fixed assets in 1989 and 1990 was 9.44 percent, and the PIA industry average was 7.11 percent.  It concluded that the higher sales-to-assets ratio meant that petitioner had an additional $2.33 in sales for each dollar that it spent on fixed assets compared to its average

competitor. Peterson Consulting attributed $603,855 of petitioner's incremental profits to petitioner's improved productivity from using SMMT. However, Peterson Consulting excluded over 50 percent of the cost of the four-color press acquired in 1989 in petitioner's sales-to-assets ratio. This omission overstates petitioner's productivity and is a significant error in the valuation. Moreover, there is evidence in the record that petitioner was inefficient and disorganized as compared with other printing companies.

Peterson Consulting also applied this inaccurate sales-to-assets ratio to project petitioner's sales without the license, further distorting the license's value. It reasoned that petitioner would not have obtained financing for the press without the license agreement. There is no factual basis to support this conclusion. When petitioner applied for a bank loan for the four-color press, it was told that it had to reduce the amount of the royalties to qualify for a loan. In that regard, without the payment of the royalties to DM, petitioner would have had above-average profitability, which makes it reasonable to conclude that it would have been able to obtain independent financing. The financing from DM is attributable to their close relationship and is not an asset transferred pursuant to the license agreement.

In general, the methodology of petitioner's expert report makes it unreliable for valuation in this case. Peterson

Consulting improperly attributed the entire amount of petitioner's labor costs savings to the assets licensed from DM. Petitioner had lower labor costs than its competitor because Nyingma employees' work ethic and dedication to the teachings and preservation of Buddhism made them willing to work for long hours at below-market wages. Petitioner contends that it was able to attract low-paid Nyingma employees only because it licensed SMMT and the Dharma name from DM. Nyingma employees valued work as a spiritual practice before working for petitioner. Petitioner's Nyingma employees had experience with the various Nyingma organizations, had studied Buddhist teachings, and read Tulku's "Skillful Means". They had practiced skillful means in prior jobs and had taken, and even taught, classes on that subject at the Nyingma Institute.

Most likely, Nyingma employees would not have worked for petitioner if it was not a Nyingma organization and associated with Buddhism. However, we are not convinced that petitioner would be a Dharma organization only if it paid royalties to DM. Petitioner's stated purpose was to support Buddhism. The active lineage referred to in the license amendment was through Tulku, not DM, and Tulku was the leader of the Nyingma community. Tulku publicly endorsed petitioner as a Dharma organization and served as honorary board chairman. Tulku personally approved petitioner's use of the Dharma name. Petitioner was viewed as an authorized Nyingma organization by members of the Nyingma community, in part, because of its association with Tulku. Tulku

was paid over $25,000 a year, independent of the royalties to DM, for his public support of petitioner. These facts reduce the purported value of the licensed Dharma name.

Petitioner argues that without the claimed royalty deductions, its profitability would be substantially higher than the industry average. However, profitability is not an accurate measure of fair market royalties in this case because petitioner's above-average profits were not attributable to the license. Petitioner's expert did not specifically value the individual assets licensed under the agreement or provide a method to allocate the proposed value among the various assets. Also, Peterson Consulting determined the profits generated by the licensed assets and did not determine a fair market royalty for the license. Thus, its expert report is only of limited utility in our decision.

We find the method of valuation provided in respondent's expert report to be more reliable than petitioner's methodology. Consequently, we focus our attention on respondent's report. Respondent's expert report was prepared by American Valuation Group, Inc. (AVG). Dr. Herbert Spiro (Spiro), AVG's president, testified regarding the valuation. In general, AVG valued the same assets considered by Peterson Consulting. AVG's expert report included the following assets and fair market royalties for the licensed assets:

| Licensed Assets | 1991 | 1992 | 1993 |
|---|---|---|---|
| SMMT | $20,400 | $21,012 | $21,642 |
| Computer software | 4,000 | 4,000 | 4,000 |
| Marketing of SMMT | 1,000 | 1,030 | 1,061 |

| | | | |
|---|---|---|---|
| Trademarks and trade names | 52,396 | 57,636 | 62,823 |
| Customer list | 106,433 | 86,098 | 69,117 |
| Right to financing | -0- | -0- | -0- |
| Covenant noncompete | -0- | -0- | -0- |
| Total | 184,229 | 169,776 | [1]158,643 |

[1] The expert report contained a mathematical error of $1 that we have corrected.

AVG used three methods of valuation to determine reasonable royalty payments pursuant to the license agreement: (1) A replacement cost method, (2) a market comparison method, and (3) an income method. The method that AVG used depended on the particular asset being valued.

First, AVG used the replacement cost method to value petitioner's right to use and commercially market SMMT and the computer software. AVG valued SMMT based on the $1,500 cost of a 4-week class at the Nyingma Institute for petitioner's eight Nyingma managers for a total cost of $10,050 in 1990. AVG added $10,400 for consultations provided by DM, mostly with Tulku, regarding the application of SMMT. It assumed a 1-hour consultation each week and a consulting fee of $200 per hour. AVG discounted the value of SMMT licensed by petitioner as compared with the courses now offered by the Nyingma Institute because SMMT was being developed and revised during the years in issue.

Respondent argues that the license agreement, as amended, did not give petitioner the right to offer SMMT instruction to nonmanagerial employees. The license agreement did not expressly mention SMMT and conveyed the right to DM's expertise and

management techniques to improve worker productivity and efficiency. We interpret the license agreement to include the right to offer SMMT to both managerial and nonmanagerial employees. Calling SMMT a management technique does not mean that it is only available to managerial employees. The purpose of SMMT is to increase productivity and efficiency in the work force. Such improvements would not be possible without providing instruction on SMMT to nonmanagerial employees. Petitioner held weekly SMMT classes for all Nyingma employees. The fact that petitioner only distributed the SMMT manuals to management does not require the conclusion that SMMT was not available to nonmanagerial employees. We find that petitioner licensed SMMT for use by its managerial and nonmanagerial employees. Thus, respondent's expert report understated the value of SMMT.

The wide availability of teachings of skillful means reduces the value of SMMT. Petitioner attempts to distinguish between skillful means, which Tulku described in his book with the same name, and the licensed asset, which petitioner refers to as SMMT. Petitioner's witnesses repeatedly referred to the book "Skillful Means" as a general introduction to the practice of Dharma and SMMT as an advanced version. However, petitioner has failed to specifically identify the differences between skillful means and SMMT that would enable us to assess the credibility of its witnesses' testimony. Based on the record before us, we believe that petitioner created an artificial distinction between

skillful means and SMMT to justify substantial transfers of its profits to DM, a closely related entity.

Moreover, we do not agree with petitioner's contention that SMMT is a proprietary trade secret that justifies the exorbitant royalties that petitioner paid to DM. "Mastering Successful Work", which DM published in 1994, relates to SMMT and sells for $14.95. The preface of the book states that it is based on materials that petitioner received pursuant to the license agreement. Petitioner denies that "Mastering Successful Work" reveals any of the allegedly proprietary SMMT materials. However, the testimony of petitioner's witness with regard to this issue is not credible. Moreover, the Nyingma Institute offers skillful means classes, and DM published a book relating to skillful means in 1978. Nevertheless, we find that petitioner's license of SMMT does support the payment of some royalties to DM.

We accept the general methodology of respondent's expert in valuing SMMT. Respondent's expert, Dr. Spiro, valued SMMT based on the tuition for classes at the Nyingma Institute. Respondent argues that SMMT had little value because Nyingma workers valued work as a spiritual practice before working for petitioner. SMMT has value to petitioner and to its Nyingma employees apart from the spiritual value that Nyingma employees place on work. SMMT enabled the Nyingma employees to develop and expand their practice of Dharma. SMMT provided a benefit to the Nyingma employees similar to an employer's offering to pay for college

courses taken by its employees. Petitioner offered the opportunity to practice SMMT in a structured environment, rather than just learning about SMMT or skillful means in a classroom setting. Petitioner argues that respondent undervalued SMMT because the materials provided under the license are more extensive than a 4-week class. We agree and adjust AVG's valuation accordingly.

AVG valued petitioner's right to market commercially SMMT as supporting royalty payments of $1,000 per year. Based on the evidence in the record, petitioner did not earn any revenues from marketing SMMT during the years in issue. AVG determined that petitioner could have reasonably expected to earn annual revenues of about $20,000 when it entered the 1990 license amendment. It based this determination on a 5-day seminar that petitioner held in 1995 that generated revenues of $7,500. AVG determined that royalty rates for the right to conduct seminars are generally 5 percent and applied this rate to the projected $20,000 annual revenues for royalty payments of $1,000 in each of the years in issue.

Maitland believed that he could earn approximately $2,000 in gross revenues from a 1-day seminar on SMMT. There is no evidence in the record that petitioner intended to market SMMT. The fact that petitioner did not conduct any SMMT seminars during the years in issue shows that this right lacked value. In addition, we find only a nominal distinction between SMMT and skillful means. Accordingly, the skillful means classes offered

by the Nyingma Institute diminish the value of petitioner's right to market SMMT. Petitioner's expert did not specifically value petitioner's right to market SMMT. As we have no other appropriate basis to evaluate this licensed asset, we accept Spiro's valuation of the SMMT marketing right.

AVG also valued the computer software using the replacement cost method and determined that the value of customized software was $20,000, based on the cost of similar software, for an annual value over a 5-year useful life of $4,000. Maitland believed that comparable off-the-shelf software would have cost between $60,000 and $70,000. However, petitioner did not consider purchasing software from another company. DM did not provide technical support for the software. This decreases the value of the software because petitioner had to update the software itself. We believe that AVG's valuation of the software is more reliable than Maitland's uncorroborated testimony and accept AVG's valuation.

Second, AVG relied on a market comparison to determine fair market royalty payments for the licensed trade names and trademarks. For the comparison, AVG considered royalties paid for instant-print or quick-print franchises. It identified the various assets received under these franchise agreements and compared the quick-print franchises with the license agreement only to the extent of the licensed trade names and trademarks. Royalty rates associated with trade names and trademarks represent the costs incurred by the franchisors to maintain the

value of the trade names and trademarks through advertising and other promotional activities. AVG determined that royalty rates attributable to advertising range from 1 to 2.5 percent of the franchisee's gross sales with an industry average of 2 percent. AVG assigned a value to the licensed trade names and trademarks of 1 percent of petitioner's gross sales, which produced royalty payments in the amounts of $52,396, $57,636, and $62,823, during the years in issue, respectively. AVG established that DM did not advertise the trade names or trademarks or engage in other promotional activities. DM has not registered the trade names or trademarks with any governmental unit. AVG believed that these facts support a value for the licensed trade names and trademarks that is substantially less than the average advertising fee rates for quick-print franchises. Petitioner contends that DM owns a nonregistered, common-law trademark in the licensed trade names. Petitioner asserts that the quick-print industry, used by AVG in its valuation, is not comparable to petitioner's business. Quick-print businesses rely on advertising to attract walk-in customers, but lithographic printers, such as petitioner, generally do not have walk-in customers. Petitioner did not advertise and relied on its quality and low prices to obtain customers.

Although DM has not engaged in commercial printing since 1985, petitioner agues that DM has developed name recognition for the word "Dharma" in the printing industry through its religious printing activity. Petitioner's customers who testified at trial

did not attribute the name Dharma to DM's religious printing business or state that they became petitioner's customers because they associated the word Dharma with DM. Petitioner attracted customers by the quality of its printing and low prices. There is no evidence that petitioner's customers associated its quality and prices with DM's business. At most, its customers associated its name with Buddhism in general and not to DM's printing business. DM has never used the names "Dharma Enterprises" or "Skillful Means Press" in the printing business. DM did use the name "Amber Lotus" beginning in 1986. Although there is no evidence as to whether DM made Amber Lotus into a profitable business before licensing it to petitioner, the name had some value to petitioners. During the years in issue, petitioner's Amber Lotus division accounted for approximately 7 percent of gross sales. We hold that an unrelated third party would have paid royalties for the trade names and trademarks in the amount determined by AVG.

In addition to being a recognized trade name in the printing business, petitioner maintains that the Dharma name identifies it as a Dharma-authorized organization and enables it to hire low-wage employees. The license agreement, as amended, purports to grant to petitioner the right to present itself as an organization sanctioned by an active Dharma lineage. Petitioner maintains that AVG's comparison of the Dharma name with quick-print trade names does not account for this value. We determine that this alleged asset does not justify the royalty payments

disallowed by respondent.  Petitioner's other connections to Buddhism and the Nyingma community also attracted low-wage employees.

Third, to calculate fair market royalty payments for DM's customer list, AVG used an income approach to estimate the revenues generated from the customer list during the years in issue.  AVG estimated the number of customers from the list that were active customers during the years in issue.  According to AVG, revenues from a customer list decrease over time as customer preferences and financial conditions change.  AVG determined a 9-year useful life for DM's customer list beginning in 1985.  AVG observed that over the 9-year life, a larger percentage of gross sales from list customers was attributable to petitioner's own efforts to maintain the customers.  Accordingly, it adjusted the list's value for petitioner's costs to maintain the list.  AVG also assumed that petitioner received the additions and changes to DM's customer list after 1985 from petitioner's merger with SMP and attributed new customers and increases in sales to a particular customer after 1985 to either petitioner's or SMP's efforts.  AVG valued the customer list, based on projected net profits generated from the list, at $106,433, $86,098, and $69,117, during the years in issue, respectively.

Although its expert provided a value for the customer list, respondent asserts that petitioner did not obtain a customer list from DM under the license agreement.  The license agreement and amendments did not mention the customer list.  Nevertheless, DM

transferred a customer list to petitioner, and the parties intended the royalties to compensate DM for the list. Respondent further argues that petitioner received the customer list in its merger with SMP. Upon termination of SMP's license with DM, SMP did not own the customer list; thus, it could not transfer it to petitioner, as respondent argues. Petitioner argues that DM also received any new customers that SMP developed when the license terminated. We do not believe the uncorroborated testimony of petitioner's witnesses that the customers developed by SMP also reverted to DM.

Petitioner's business records show that it retained a larger number of customers than AVG predicted. Over 50 percent of petitioner's gross sales during the years in issue were attributable to customers from DM's customer list. Petitioner argues that AVG did not consider the actual sales generated by DM's customers when determining the value of the customer list. We recognize this as a flaw in respondent's valuation of the customer list, but there is no evidence in the record of the revenues generated by the customers in 1985. As AVG established, it is necessary to adjust the value of the customer list for petitioner's own efforts to maintain and increase the sales to the customers. SMP's 1987 gross sales of $2.8 million provide some insight into the portion of sales revenues that is due to petitioner's efforts. Without specific information about the revenues generated from the customers in 1985, our ability to value the customer list is limited. However, we find that

respondent undervalued the customer list, and we adjust our decision accordingly.

AVG determined that petitioner's ability to obtain financing from DM had no value as part of the license agreement.  DM, acting with other Nyingma organizations, provided financing to petitioner at about 16-percent interest for the purchase of its initial printing equipment and the four-color press in 1989.  AVG determined that the prevailing interest rate in 1989 was about 10 percent.  AVG concluded that the license did not give petitioner the right to below-market financing.  Therefore, AVG did not assign any value to petitioner's purported right to financing.

Petitioner argues that it would not have been able to start its business without financing from DM and the Nyingma network and community because petitioner's members did not make capital investments in the business.  Petitioner paid interest on the money borrowed from DM, and there is no evidence that the interest rate was below the market interest rate.  We doubt that DM provided financing as an independent third party or because of the license agreement.  Rather, DM provided financing because of its close relationship with petitioner and because DM intended to receive the majority of petitioner's profits disguised as royalty payments.  We hold that the financing from DM has no effect on the royalty value.

AVG also did not assign a value to DM's 5-year covenant not to compete in commercial printing and DM's agreement to refer customers to petitioner.  AVG reasoned that DM ceased commercial

printing in 1985 in order to maintain its tax-exempt status and that DM did not intend to return to the commercial printing business. Without an intent to compete, AVG believed that the covenant lacked economic meaning. In addition, petitioner indicated to AVG that customer referrals by DM were rare.

Taxpayers may amortize the amount paid for a covenant not to compete over its useful life. Sec. 167(a); Warsaw Photographic Associates, Inc. v. Commissioner, 84 T.C. 21, 48 (1985). A covenant not to compete must have "economic reality"; i.e., some independent basis in fact or some arguable relationship with business reality so that a reasonable person would bargain for the agreement. Patterson v. Commissioner, 810 F.2d 562, 571 (6th Cir. 1987), affg. T.C. Memo. 1985-53; Beaver Bolt, Inc. v. Commissioner, T.C. Memo. 1995-549. The parties did not allocate a portion of the royalties to the covenant.

Courts apply numerous factors in evaluating a covenant not to compete. These include: (a) The grantor's (i.e., covenanter's) business expertise in the industry; (b) the grantor's intent to compete; (c) the grantor's economic resources; (d) the potential damage to the grantee posed by the grantor's competition; (e) the grantor's contacts and relationships with customers, suppliers, and other business contacts; (f) the grantee's interest in eliminating competition; (g) the duration and geographic scope of the covenant; and (h) the grantor's intention to remain in the same geographic area. Warsaw Photographic Associates, Inc. v. Commissioner, supra.

After considering the above factors, we find that the covenant had economic reality and assign an appropriate value to it. DM had the ability and expertise to enter into the commercial printing business. DM stopped printing for commercial customers in 1985 and sold printing equipment to petitioner. However, DM continued to print and publish Tibetan Buddhist texts and art. DM's reputation as a Buddhist printer could easily translate into a commercial printing business. In addition, DM had the necessary expertise, equipment, skilled personnel, and contacts with suppliers to become a commercial printer. Moreover, DM could adversely affect petitioner's business if DM competed with petitioner. On the other hand, performing commercial printing would jeopardize DM's tax-exempt status and distract from its Buddhist traditions. We believe that DM may have reentered the commercial printing business in the absence of the payments from petitioner.

We hold that royalty payments in the amounts of $265,000, $250,000, and $240,000 for the years in issue, respectively, are reasonable compensation for the licensed assets and DM's covenant not to compete.

Petitioner contends that the disallowed portion of the royalty payments is deductible under section 162 as payments made to a charitable organization in expectation of commensurate financial benefit. Sec. 1.170A-1(c)(5), Income Tax Regs. However, petitioner did not have a reasonable expectation of financial return in the amount of the payments because it paid

the substantial majority of its after-tax profits to DM. There is no evidence that petitioner received any economic benefits from the payments to DM beyond the value of the licensed assets. The excessive portion of the payments to DM is not deductible under this argument.

In the notice of deficiency, respondent did not allow petitioner to deduct any portion of the disallowed payments to DM as charitable contributions under section 170. Petitioner did not address on brief the deductibility of the excess payments to DM as charitable contributions under section 170 and has not proven that it is entitled to section 170 deductions.

Net Operating Loss Deduction

Respondent disallowed NOL deductions in taxable years 1991 and 1993. Petitioner generally has the burden of proof with regard to NOL deductions. Hill v. Commissioner, 95 T.C. 437, 439-444 (1990). Petitioner contends, however, that respondent has the burden to show that petitioner is not entitled to the NOL carryforwards because respondent did not specify the disallowance of the NOL's in the statements or explanations attached to the notice of deficiency.

Respondent is not required to provide a factual basis for disallowed deductions. United States v. Zolla, 724 F.2d 808, 809-810 (9th Cir. 1984); Finkelman v. Commissioner, T.C. Memo. 1989-72, affd. 937 F.2d 612 (1991). The notice must (1) advise the taxpayer that respondent in fact has determined a deficiency, and (2) specify the year and amount of the deficiency. Campbell

v. Commissioner, 90 T.C. 110, 115 (1988).  Petitioner argues that respondent must specify the year in which the NOL's that produced the disallowed carryover deduction arose and the reasons respondent disallowed the NOL's in that year.  We disagree.  The notice of deficiency in this case identifies the years in which the NOL deductions were disallowed and the amount of the disallowed NOL deductions.  See sec. 7522.  This is a sufficient explanation to apprise petitioner with regard to the NOL deductions, and the burden of proof has not shifted to respondent on that issue.

Petitioner has failed to present sufficient evidence to substantiate the claimed carryover losses that it deducted in taxable years 1991 or 1993.  In addition, petitioner's expert report does not address the value of the license in taxable years 1989 and 1990.  We sustain respondent's determination.

Adjustment to Gross Sales

Respondent determined that petitioner's gross sales as shown on its books and records are greater than its gross sales as reported on its 1991 income tax return.  Petitioner reduced gross sales reflected on its books for 1991 in the amount of $7,095 in reporting gross sales to correct a customer overbilling.  It introduced business records reflecting the overbilling, including the invoices, a credit memorandum, and business journals.  In addition, Maitland explained the nature of the discrepancy in the amount of gross sales reported and shown on petitioner's books

and records.  We find that petitioner accurately reported its 1991 gross sales.

## Section 6662 Penalty

Section 6662(a) imposes a penalty of 20 percent of the portion of an underpayment attributable to one or more of the items set forth in section 6662(b), including negligence or disregard of rules or regulations.  See sec. 6662(b)(1). Negligence is defined as the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances.  Neely v. Commissioner, 85 T.C. 934, 947 (1985).  A section 6662 accuracy-related penalty does not apply with respect to any portion of an underpayment if reasonable cause exists for the underpayment and the taxpayer acted in good faith with respect to such portion.  Sec. 6664(c)(1).  The determination of whether a taxpayer acted with reasonable cause and in good faith depends upon the pertinent facts and circumstances of the case.  Sec. 1.6664-4(b)(1), Income Tax Regs. Petitioner bears the burden of proving that the penalty does not apply.  Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982).

We find that petitioner paid royalties to DM significantly in excess of the value of the licensed assets.  These payments, which were a substantial portion of petitioner's profits, were made to a closely related company.  The people in control of petitioner and DM were similarly motivated to promote Buddhist teachings.  Petitioner paid its profits to DM as royalties rather

than making contributions to Buddhist organizations in line with its stated purpose to financially support the preservation of Buddhism. Petitioner has never made a charitable contribution to support Buddhism. Petitioner acted negligently and in disregard of rules or regulations with regard to its deductions of the royalty payments to DM. Therefore, it is liable for a section 6662 penalty for each of the years in issue.

To reflect the foregoing,

Decision will be entered

under Rule 155.
